# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FREEDOM WIRELESS, INC., | ) | Civil Action No. 05-CV-11062-EFH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOSTON COMMUNICATIONS GROUP, INC. | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| AND RELATED COUNTERCLAIMS | ) | |
| | ) | |

## AFFIDAVIT OF MARSHALL M. SEARCY IN SUPPORT OF PLAINTIFF FREEDOM WIRELESS, INC.'S OPPOSITION TO DEFENDANT BOSTON COMMUNICATION'S MOTION FOR A STAY OF THIS ACTION PENDING RESOLUTION OF THE FEDERAL CIRCUIT APPEALS

8048.1

I, Marshall M. Searcy III, declare as follows:

1.      I am a partner of Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for plaintiff Freedom Wireless, Inc.  I submit this declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit A is a true and correct copy of the declaration of Larry Day in Support of Plaintiff Freedom Wireless, Inc.'s Motion for Injunctive Relief.

3.      Attached as Exhibit B is a true and correct copy of Emergency Motion of Boston Communications Group, Inc. to Construe or Stay the District Court's Injunction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of December 2005, in Los Angeles, California.

_____
Marshall M. Searcy III

8048.1

-2-

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FREEDOM WIRELESS, INC., ) | Civil Action No. 00-CV-12234-EFH |
| ) | |
| Plaintiff, ) | DECLARATION OF LARRY DAY |
| ) | IN SUPPORT OF PLAINTIFF FREEDOM |
| v. ) | WIRELESS, INC.'S MOTION |
| ) | FOR INJUNCTIVE RELIEF |
| BOSTON COMMUNICATIONS GROUP, ) | |
| INC. et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| And Related Counterclaims. ) | |
| ) | |

1.    My name is Larry Day. I am over 21 years of age, am of sound mind, have never been convicted of a felony, and am able to make the following statements under oath based on my personal knowledge.

2.    I am the President of Freedom Wireless, Inc., plaintiff in this action.

3.    On July 14, 2005, Freedom and Convergys Corporation executed a license agreement. Pursuant to the agreement, Freedom granted a royalty bearing license under its patents to Convergys to offer a prepaid wireless service to wireless carriers on a nationwide basis. The specific terms of the agreement are confidential.

4.    On September 15, 2005, Freedom and Telcordia Technologies, Inc. executed a license agreement. Pursuant to the agreement, Freedom granted a royalty bearing license under its patents to Telcordia to offer a prepaid wireless service to wireless carriers on a nationwide basis. The specific terms of the agreement are confidential.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of September 2005, at Phoenix, Arizona.

_____
Larry Day

02624/679041.1

**DAY DECLARATION**

# EXHIBIT B

06-1020

---

IN THE

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

FREEDOM WIRELESS, INC.,

*Plaintiff/Counterclaim Defendant-*
*Appellant,*

v.

BOSTON COMMUNICATIONS GROUP, INC.,

*Defendant/Counterclaimant-*
*Appellee, et al.*

---

EMERGENCY MOTION OF BOSTON COMMUNICATIONS GROUP, INC.
TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION

---

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue
Washington, DC 20001-4413
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA 94304-1016
(650) 849-6600

*Attorneys for Defendant/Counterclaimant-*
*Appellee Boston Communications Group, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.      STATUS OF MATTER ....................................................................................... 1

II.     PRELIMINARY STATEMENT ......................................................................... 2

III.    STATEMENT OF FACTS ................................................................................... 4

      A.      The Patents in Suit .................................................................................... 4

            1.      The Required Step of "Directly" Connecting Calls from the
                 Prepaid System to the LEC ............................................................. 5

            2.      The Required "Periodic Validation" Accounting Method ................ 5

      B.      BCGI's Prepaid Service Bureau ............................................................... 7

      C.      The CSI Prior Art ...................................................................................... 9

      D.      The Jury's Verdict .................................................................................... 11

IV.     ARGUMENT ...................................................................................................... 12

      A.      BCGI's Appeal Will Likely Succeed ....................................................... 12

            1.      The Injunction Is Impermissibly Broad ........................................ 12

            2.      The District Court Erroneously Instructed the Jury on Joint
                 Infringement ................................................................................... 13

            3.      No Reasonable Jury Could Conclude That the Defendants Infringe
                 the 17 "Direct Connection" Claims Under the Doctrine of
                 Equivalents .................................................................................... 15

            4.      No Reasonable Jury Could Conclude That BCGI's Service Bureau
                 Performs "Periodic Validation" ..................................................... 16

            5.      The Remaining Claims Are Invalid ............................................... 16

      B.      BCGI Will Be Irreparably Harmed Unless Its Requested Relief Is Granted ........ 17

      C.      Freedom Will Not Be Harmed If BCGI's Requested Relief Is Granted ............... 18

      D.      The Public Will Be Harmed If a Stay Is Not Granted ............................. 19

V.      CONCLUSION ................................................................................................... 20

i

# TABLE OF AUTHORITIES

## Cases

*Advanced Display Sys. v. Kent State Univ.,*
   212 F.3d 1272 (Fed. Cir. 2000) ............................................................. 17

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
   424 F.3d 1293 (Fed. Cir. 2005) ............................................................. 14

*CytoLogix Corp. v. Ventana Med. Sys., Inc.,*
   424 F.3d 1168 (Fed. Cir. 2005) ............................................................. 16

*E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.,*
   835 F.2d 277 (Fed. Cir. 1987) ............................................................... 19

*Int'l Rectifier Corp. v. IXYS Corp.,*
   383 F.3d 1312 (Fed. Cir. 2004) ............................................................. 13

*J & M Corp. v. Harley-Davidson, Inc.,*
   269 F.3d 1360 (Fed. Cir. 2001) ............................................................. 15

*KSM Fastening Sys. v. H.A. Jones Co., Inc.,*
   776 F.2d 1522 (Fed. Cir. 1985) ............................................................. 13

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
   242 F.3d 1337 (Fed. Cir. 2001) ............................................................. 16

*Seachange Int'l, Inc. v. C-Cor Inc.,*
   413 F.3d 1361 (Fed. Cir. 2005) ............................................................. 15

*Searfoss v. Pioneer Consol. Corp.,*
   374 F.3d 1142 (Fed. Cir. 2004) ............................................................. 15

*Standard Havens Prod., Inc. v. Gencor Indus., Inc.,*
   897 F.2d 511 (Fed. Cir. 1990) ............................................................... 12

## Other Authorities

Mark A. Lemley, et al., *Divided Infringement Claims,*
   33(3) AIPLA Q.J. 255 (2005) ................................................................ 14

## I.    STATUS OF MATTER

Boston Communications Group, Inc. ("BCGI") provides accounting-related services (principally call rating and debiting services) in connection with prepaid wireless (cellular) telephone calls.  BCGI provides its services (called a "service bureau") to a number of wireless carriers, including its codefendant carriers.

Following a jury verdict that BCGI and its codefendant carriers "jointly" infringed the '067 and '823 patents owned by Freedom Wireless, Inc. ("Freedom"), the district court denied BCGI's JMOL motions and entered a permanent injunction.  Ex. 1 (Oct. 17, 2005 Order for Permanent Injunctive Relief).[1]  Freedom has stated that the injunction extends beyond the activities of BCGI and its codefendants, and prohibits BCGI from acting in concert with *any* third party to provide prepaid wireless services.  Ex. 2 (Freedom Press Release). On November 9, 2005, the district court—without opinion—denied BCGI's motion for clarification or stay, in which BCGI asked the court either to clarify that its injunction did not apply to non-defendant carriers or, if it did, to stay that aspect of its injunction pending appeal.  Further, while BCGI made a fallback request asking the court at least to grant a temporary stay for two weeks (to give BCGI time to seek a stay pending appeal from this Court), in denying BCGI's motion, the district court said nothing about that request.

---

[1] BCGI filed a notice of appeal on October 20, 2005.  Due to administrative delays at the district court, however, BCGI's appeal has not yet been docketed in this Court.  Accordingly, BCGI is filing this motion in Freedom's appeal from the same case below.

1

BCGI therefore requests that this Court either (1) construe the district court's injunction not to apply to non-defendant carriers, or (2) to the extent it does cover non-defendant carriers, stay the injunction pending resolution of BCGI's appeal. BCGI does not seek to stay the injunction as it applies to the defendant carriers. Further, to preserve the status quo, BCGI asks the Court to issue a temporary stay to last only until the Court rules on this motion. BCGI has discussed this motion with the other parties to this appeal. Freedom objects and intends to respond.

## II.    PRELIMINARY STATEMENT

If Freedom's interpretation of the injunction is correct, it is a death warrant for BCGI. Freedom's interpretation goes far beyond the jury verdict, which found that each carrier defendant and BCGI jointly infringe Freedom's two patents. Indeed, the verdict was expressly limited to the *combined* activities of BCGI and each carrier defendant, and was based on evidence that was specific to each carrier's use of BCGI's service bureau. In fact, the carrier-specific nature of Freedom's allegations had previously led the district court to rule that whether the patents are jointly infringed by BCGI and other, *non-defendant* carriers—whose activities are now at issue in *other* cases that Freedom filed—is beyond the scope of this case.

Unless the injunction is construed not to cover non-defendant carriers, or is stayed to the extent it does, BCGI is unlikely to survive to see this Court's decision on the merits. And the merits of BCGI's appeal are substantial. For example, while this Court has never directly decided the issue, it has suggested that an agency or similar control relationship would be required if the activities of two

2

parties were to be combined to prove direct infringement. The district court, however, imposed no such requirement in this case.

Further, the district court failed to enforce two clear estoppels that mandate a judgment of non-infringement on all but five claims. First, the district court expressly found that Freedom had disclaimed (both in the specification and during prosecution) anything other than a direct connection between two claimed components, yet permitted the jury to find that the defendants, who (at most) connect those two components indirectly, infringed the relevant claims under the doctrine of equivalents. Second, the district court found that the "periodic validation" accounting method described in Freedom's patents was an "important" part of the claimed invention and interpreted every claim with an accounting step to require periodic validation. Yet, even though BCGI uses an accounting method of the precise type that Freedom criticized and distinguished from its own method of "periodic validation," the district court let the jury's infringement verdict on these claims stand.

The remaining five claims, which deal with very basic methods of call forwarding and verification (but not periodic validation), are anticipated by a prior art system described in a publicly available brief and supporting testimony filed in a California administrative proceeding. BCGI's expert provided a detailed explanation of that documentation and how it taught every element of the five remaining claims. Notably, Freedom never offered an expert or other evidence to challenge BCGI's evidence. Instead, Freedom relied only on the arguments of its

3

attorney, who focused on irrelevancies such as limitations that were in *other* claims or whether the prior art included flow-charts.

BCGI has the right to ask this Court to redress these (and other) errors. That right, however, is of no value to BCGI if it goes bankrupt during this appeal. Accordingly, BCGI respectfully requests that this Court stay the district court's injunction during the pendency of this appeal, but only as it concerns BCGI's activities with non-defendant carriers.

## III.   STATEMENT OF FACTS

### A.    The Patents in Suit

The '067 and '823 patents (Exs. 3 and 4) share a common specification (all specification cites are to the '823 patent) and are directed to a prepaid service that interfaces with a conventional wireless telecommunications system. Figure 1 "generally describe[s] the system of the present invention." Ex. 4 at 5:5-8. In this system, a phone call is received at a wireless carrier's Mobile Telephone Switching Office ("MTSO") (8) via cell tower (4). *Id.* at 3:55-61. The MTSO then determines whether the caller is a prepaid subscriber. *Id.* at 5:28-35. If not, the call is forwarded, in the conventional manner, from the MTSO to the Local Exchange Carrier ("LEC") (20), which completes the call. *Id.* at 5:17-21. If the subscriber is prepaid, however, the MTSO forwards the call to prepaid service provider (10) having a host computer (16), which validates the account and then, assuming the account is valid, forwards the call *directly to* the LEC. *Id.* at 5:25-35; 5:66-6:10.

### 1. The Required Step of "Directly" Connecting Calls from the Prepaid System to the LEC

A prepaid service provider/host computer that connects prepaid calls to the LEC is an important part of the invention. The service provider of "the invention" is repeatedly described as being responsible for directing prepaid calls to the LEC (*see id.* at 4:15-19; 6:8-10; 8:17-21), and Freedom repeatedly emphasized its importance while prosecuting claims that recited a "pre-paid switching system." *See* Ex. 5 (Nov. 25, 1996 Amend.) at 2, 4-5; Ex. 6 (Mar. 26, 1997 Amend.) at 6-7; Ex. 7 (Mar. 14, 1997 facsimile) at 2.

Indeed, so important is this method of connecting calls to the invention that the district court expressly found that Freedom had disclaimed anything other than a direct connection between the LEC and the prepaid system for any claim reciting a "pre-paid switching system" or requiring the prepaid system to connect the call. Ex. 8 (Apr. 23, 2003 Claim Construction Order) at 14, 16. This disclaimer is reflected in the district court's construction of 17 of the 32 asserted claims: '067 patent claims 10-14, 16, and 18; and '823 patent claims 29-31, 34, 36, 39, 42, 53, 57, and 59. *See* Ex. 9 (claim construction submitted to jury).

### 2. The Required "Periodic Validation" Accounting Method

The specification also describes a "periodic validation" accounting method. *See* Ex. 4, Fig. 7; 8:33-9:15. This method periodically validates the account and "decrements" (deducts from) the subscriber's account balance *while the call is in progress*. *Id.* at 4:20-25. While money can be directly taken from the account, in the preferred embodiment the account balance is converted into a time value that is

5

based on, for example, the time of day, the number being called, etc. *Id.* at 8:38-56. As the call progresses, the account balance is periodically reduced in intervals that correspond to minimum billing increments of currency or time. *Id.*

The periodic validation of the account using the "time value" embodiment is illustrated in the flow chart of Fig. 7. As shown in block 132 of that figure, the periodic validation is set to occur every minute (although it could be set for other billing increments (*see id.* at 8:42-43)). Accordingly, each time a minute elapses in the computer's timer, another validation request is made of the account until the account lacks sufficient funds for another billing increment and the call is disconnected. *See id.* at 8:57-67; Fig. 7 (loop 128-32).

The patent's "Summary of the Invention" emphasizes periodic validation, stating that "[i]t is important to note the time value is deducted from the account balance at regular intervals of time while the call is in progress" and that the amount deducted is "based upon elapse of pre-determined time periods at the predetermined time value for cellular telecommunications." *Id.* at 4:20-25.

The specification also contrasts "periodic validation" with a prior art method, typified by the prior art "D'Urso telecommunications system," that calculates a maximum call duration at the beginning of the call based on the account balance that was available before the call began and then sets an alarm or timer using the computer's internal clock. *See id.* at 3:15-35. The specification stresses the significance of the difference between "periodic validation" and alarm-based systems, like D'Urso, that update the balance after a call has ended. For example, immediately after describing the call accounting feature of D'Urso, the

6

specification states that its invention "is fundamentally different" from D'Urso. *Id.* at 3:36-40. Freedom also distinguished D'Urso from the invention on this basis during prosecution, arguing that a limitation reciting "decrementing the subscriber account balance at regular intervals during the telecommunications event" was "not disclosed or suggested by" D'Urso. Ex. 10 (Jun. 17, 1996 Amend.) at 6, 12.

In construing the claims that recited some kind of accounting, the district court recognized that Freedom described validation at regular intervals as an "'important' part of the invention." Ex. 8 at 34  It therefore construed claims 10-14 and 16-18 of the '067 patent and claims 2-3, 5, 9, 11, 12, 15, 17, 19, 20, 29-31, 34, 36, 39, 42, 53, 57, and 59 of the '823 patent accordingly. *See* Ex. 9.

### B.    BCGI's Prepaid Service Bureau

Three implementations of BCGI's service bureau are at issue in Freedom's suit:  the Multi-Frequency ("MF") implementation, the SS7 implementation, and the Pre-IN implementation. Ex. 11 (Mar. 11, 2005 Trial Tr.) at 77-79. However, BCGI does not use these implementations to provide prepaid wireless services to cellular subscribers.  Rather, it is the wireless carriers that interface with subscribers using their own networks.  For example, the wireless carriers' equipment determines that a call is from a prepaid wireless subscriber; if it is, information about the subscriber and the call is sent to BCGI's service bureau. Ex. 12 (Apr. 13, 2005 Trial Tr.) at 43-45.

In the MF implementation, for example, the carrier's MTSO (labeled "switch" in the figure below) transfers the call to the BCGI "Node," a computer that is physically located near the MTSO (*id.* at 45):



**MF Implementation**

The Node then passes subscriber and call information to a central computer, called a "Responder," located in one of BCGI's Massachusetts facilities. *Id.* The Responder calculates the maximum duration of the call based on the balance available in the subscriber's account and sends that information back to the Node, which—as in the D'Urso prior art system—sets an alarm. *Id.* at 45-46. At that point, the Node sends the call back to the MTSO, which then completes the call by, for example, forwarding it to an LEC. *Id.* at 47. Since the carrier's MTSO is responsible for completing the call, no component of the BCGI service bureau connects the call to the LEC. *Id.* If the maximum call duration is reached, the alarm goes off and the call is disconnected. *Id.* at 65-66. Upon termination of the call (either because one party hangs up or the maximum call duration is reached), the Node informs the Responder of the end time of the call and the Responder re-calculates the available balance in the subscriber's account. *Id.* Thus, the BCGI service bureau—again like D'Urso—is incapable of updating a subscriber's account while a call is in progress. *Id.* at 72-74.

The SS7 and Pre-IN implementations similarly do not directly connect calls to an LEC. *Id.* at 78, 87-88, 95; *see also* Ex. 13 (Mar. 14, 2005 Trial Tr.) at 125. Likewise, both the SS7 and Pre-IN implementations calculate the maximum call

8

duration before the call begins and set an ordinary computer clock alarm.  Ex. 12 at 88, 94; Ex. 13 at 81; Ex. 14 (Mar. 15, 2005 Trial Tr.) at 34.[2]

### C.    The CSI Prior Art

In November 1991, Cellular Service, Inc. ("CSI") filed a proposal with the California Public Utilities Commission ("CPUC") requesting it to order wireless carriers doing business in California to allow CSI to connect its own system to the carriers' switches (MTSOs).  Ex. 15 (Opening Brief of Cellular Service, Inc.) at 3-8.  CSI's proposal included a brief (Ex. 15) and supporting testimony, including the written testimony of Donald Raney (Ex. 16), Harry Midgley (Ex. 17), and Ralph Widmar (Ex. 18), that were available to the public as of the brief's filing in the CPUC on November 7, 1991. (*See* date stamp on Ex. 15.)  Freedom's first patent application was filed more than three years later (on December 23, 1994).

The CSI brief generally describes the CSI system and the services that CSI intended to provide with it, specifically citing the written testimony that CSI presented to the CPUC.  Ex. 15 at 2.  These materials were discussed at trial by BCGI's expert (Professor Wicker), who testified that the CSI proposal anticipates claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent.  These five claims, unlike the other asserted claims, do not require "periodic validation" or a direct connection between the prepaid service and LEC.  Ex. 9.  Instead, they describe only very basic methods of forwarding a prepaid call to a prepaid service

---

[2]    Although there are significant differences among the various BCGI implementations that affect some of BCGI's other non-infringement defenses, the characteristics described in this motion that should have led to a finding of non-infringement are shared by every implementation.

provider that (in claims 1, 27, and 28 only) performs a simple verification of a valid account. Professor Wicker explained how the CSI proposal anticipated all of these claims. Ex. 12 at 17-19; Ex. 19 (Apr. 12, 2005 Trial Tr.) at 121-122.

For example, the CSI proposal (in Widmar's testimony) describes a host of services that CSI intended to provide, including prepaid service. Ex. 18 at 8 ("[c]ustomers who present credit risks could be required to pre-pay for service"). Moreover, the proposal (in Midgley's testimony) set out in great detail the technology that made CSI's services possible. Ex. 17 at 1-22. And Professor Wicker explained to the jury where Midgley described how the MTSO would forward the calls of CSI's customers (including prepaid subscribers) to CSI's system, which also verifies the prepaid subscriber's account. Ex. 19 at 48-52. Professor Wicker concluded that the CSI proposal anticipates claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. Ex. 19 at 101-106, 121-122; Ex. 12 at 17-19.

Freedom offered no competing evidence. Instead, Freedom's counsel personally attacked Professor Wicker and argued his testimony should be disregarded because (1) the CSI proposal failed to describe either periodic validation or cutting off a call when funds run out (Ex. 20 (May 11, 2005 Trial Tr.) at 175), notwithstanding that numerous claims (including the five discussed here) did not include those limitations; (2) the CSI documentation mentioned prepaid service just once (*id.* at 126-127, 174-175); (3) there were no flowcharts in the CSI materials (*id.* at 175); and (4) Professor Wicker relied on numerous documents (the

10

CSI brief and supporting affidavits), but anticipation requires all claim elements to be present in a single document (Ex. 21 (Apr. 15, 2005 Trial Tr.) at 101-106).

### D.    The Jury's Verdict

Because neither BCGI alone nor the carriers alone performed every step of any claim, Freedom asserted, and the district court agreed, that the jury could combine the actions of BCGI and the defendant carriers to find direct infringement. Ex. 22 (jury verdict forms). However, the district court refused to allow Freedom to assert that BCGI's use of its service bureau for other, non-defendant carriers constituted infringement (Ex. 23 (Order dated April 27, 2005) at 1), explaining that the non-defendant carriers' conduct was not part of this case and that Freedom would have to file separate actions to "pursue claims arising from conduct involving non-defendant carriers" (*id.* at 2), which Freedom has now done (Exs. 24 and 25 (*Freedom v. Alltel/BCGI* and *Nextel/BCGI* complaints)). Accordingly, the jury considered only the activities of BCGI and the carrier defendants. Ex. 22.

The jury found joint infringement of the asserted claims by BCGI and the carriers, but did so following improper, overbroad instructions to which BCGI had objected. Specifically, after the district court rejected BCGI's arguments that joint infringement can occur, if at all, only where one party controls the actions of the other (such as where there is an agency relationship), the jury was instructed that Freedom need only prove that BCGI and the carriers "work together to perform all of the steps of a claim." Ex. 26 at 9-10.

Further, notwithstanding that every implementation of the BCGI system lacks a direct connection to the LEC, the jury concluded that the "direct

11

connection" claims were nevertheless infringed under the doctrine of equivalents. The jury also found that the defendants infringed all of the "periodic validation" claims, even though, like D'Urso, BCGI uses an alarm and deducts from the subscriber's account balance only after a call ends. *See* pages 8-9 *supra.*

Finally, the jury found that BCGI did not prove that claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent were anticipated, notwithstanding BCGI's uncontested evidence that every feature of those claims could be found in the CSI proposal.

## IV.  ARGUMENT

Whether an injunction should be stayed pending appeal involves four considerations: (1) likelihood of success on the merits, (2) irreparable harm to the moving party; (3) substantial harm to the non-moving party; and (4) the public interest. *Standard Havens Prod., Inc. v. Gencor Indus., Inc.,* 897 F.2d 511, 512 (Fed. Cir. 1990). Where the harm resulting from denial of the stay is considerable, however, a lesser showing is required regarding likelihood of success. All that is required is that the moving party raise a substantial issue. *Id.* at 513.

### A.    BCGI's Appeal Will Likely Succeed

#### 1.    The Injunction Is Impermissibly Broad

Freedom insists the injunction against BCGI's use of its service bureau for non-defendant carriers extends the jury's verdict in this case to cover the activities of non-parties, including those that are currently the subject of separate, pending litigations where the issues of infringement, validity, and enforceability are contested. That cannot be correct. There is no evidence in the record that any

12

alleged conduct of BCGI and the non-defendant carriers constitutes joint infringement, even under the district court's erroneous instructions, or that it is "not more than colorably different" from the conduct found to infringe. *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) ("[T]he only acts [an] injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices."). In this context, therefore, separate lawsuits (which are now underway) are required to determine whether the joint conduct of other carriers and BCGI infringes, and that conduct cannot be enjoined. *See KSM Fastening Sys. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1531 (Fed. Cir. 1985) (injunction cannot cover activity that requires litigation of "substantial new issues").[3]

### 2.    The District Court Erroneously Instructed the Jury on Joint Infringement

The judgment of infringement in this case rests entirely on Freedom's theory, adopted by the district court in its jury instructions, that there could be joint direct infringement even without a showing that BCGI controlled the actions of a carrier defendant (or vice versa). That is, it is enough (following Freedom's joint infringement theory) if one party performs some of a claim's steps and a second party performs the remaining steps. This Court, however, has never directly addressed whether such a "joint infringement" theory exists, much less adopted the theory. Indeed, if anything, this Court's recent decision in *Cross Medical*

---

[3] Freedom has in fact filed separate lawsuits against other carriers, including intervenor Nextel, which deals with this issue in more detail in its brief. BCGI will not repeat those arguments here, but instead joins Nextel's brief.

13

*Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), suggests that the Court would likely reject the theory. There, the Court rejected the patentee's argument that the actions of surgeons could be joined with those of the defendant medical device manufacturer to establish direct infringement by the manufacturer, observing that no agency relationship existed between the surgeons and the manufacturer. *Id.* at 1311.

Moreover, as Professor Lemley of Stanford Law School recently observed, an "important policy purpose" is served by preventing patentees from pursuing joint infringement theories where different entities separately perform claimed steps without any one of them controlling the actions of the others:

> Direct infringement is a strict-liability offense, but it is limited to actually performing all the steps of a patented process. By contrast, indirect liability requires evidence of "specific intent" to induce infringement, or knowledge that a good is specially adapted for aiding infringement and has no other use. Construing the patent laws to permit the individual, non-infringing acts of unrelated parties together to add up to infringement would render both § 271(b) and § 271(c) meaningless. . . . [O]n a theory of joint infringement, no one need ever sue for inducement.

Mark A. Lemley, et al., *Divided Infringement Claims*, 33 AIPLA Q.J. 255, 261-62 (2005).

Assuming that this Court holds that there is such a thing as joint infringement, but that it requires proof of an agency or similar "control" relationship between the parties, a directed judgment in BCGI's favor would be required because Freedom presented no evidence of such a relationship. Similarly,

14

if this Court were to impose an intent or knowledge requirement, a new trial would be required, since the jury was never instructed that intent or knowledge was needed to establish liability.

### 3. No Reasonable Jury Could Conclude That the Defendants Infringe the 17 "Direct Connection" Claims Under the Doctrine of Equivalents

The district court expressly found during claim construction that Freedom had disclaimed any connection other than a direct one from the prepaid switching system to the LEC. The natural consequence of that finding was that Freedom should have been precluded from proving infringement under the doctrine of equivalents. *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir. 2001) ("Structure expressly disclaimed in the specification, of course, cannot be considered an equivalent under the doctrine of equivalents.").

Further, the "all-elements-rule" prevents a finding that a system, like BCGI's, that does not connect calls directly to an LEC infringes any claim requiring a direct connection. *See, e.g., Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005) (rejecting the argument that "indirect [computer network] interconnections can be equivalent to a network in which every processor is connected to every other processor by direct, point-to-point interconnections" because "such a theory would vitiate the requirement that every processor be connected to every other processor point-to-point"); *see also Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004) ("[W]e must . . . agree with the district court that, 'to find, as [Searfoss] argue[s], that the 'indirect connection'

constitutes an equivalent of the direct connection function described in Claim 3 would, in effect, completely vitiate the connection function.'").[4]

### 4.   No Reasonable Jury Could Conclude That BCGI's Service Bureau Performs "Periodic Validation"

As a matter of law, none of the "periodic validation" claims can be infringed, either literally or under the doctrine of equivalents, by the defendants. As explained above, Freedom's patent contrasts the invention's accounting method with prior art accounting methods, like the one employed by the D'Urso prior art system, that set an alarm based on a maximum call duration calculated before the call begins. Yet, this is exactly the kind of accounting method employed by BCGI. Therefore, Freedom should have been prevented, as a matter of law, from asserting that the defendants infringe any claim requiring periodic validation. *See Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345-47 (Fed. Cir. 2001) (patentee cannot prove infringement where accused product possesses feature "specifically identified, criticized, and disclaimed" in the specification).

### 5.   The Remaining Claims Are Invalid

The only claims not subject to the two non-infringement arguments discussed above are claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. All of the limitations of these claims, however, were described in the

---

[4] Freedom challenged both the "periodic validation" and "direct connection" claim constructions below. Even if it successfully challenged those constructions in this Court, however, this Court could not affirm the judgment. In that situation, BCGI would be entitled to a new trial on invalidity, since the jury was required to apply the correct construction in considering BCGI's invalidity arguments. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1176 (Fed. Cir. 2005).

CSI proposal made more than a year before the Freedom patents were filed. *See* pages 9-10 *supra*. Freedom provided no evidence to rebut Professor Wicker's testimony, and the criticisms of the CSI proposal raised by Freedom's trial counsel are irrelevant (*see* pages 10-11 *supra*) and could not have provided the jury with a legitimate basis for rejecting BCGI's uncontradicted evidence. In particular, the limitations that Freedom's counsel alleged were missing from the CSI proposal (periodic validation and mid-call cut-off) do not appear in these five claims. Moreover, there is no requirement that the prior art include flow charts or mention a concept (prepaid service) multiple times to anticipate.

Similarly irrelevant is Freedom's argument that Professor Wicker relied on multiple documents in putting together his anticipation testimony. The documents Professor Wicker relied on—the CSI brief and supporting testimony—were all part of an integrated document (the brief) and collectively describe different aspects of a single system. The jury was not free to disregard Professor Wicker's analysis simply because it relied on more than one document. *See Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1282-83 (Fed. Cir. 2000) ("Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document.")

In sum, therefore, no reasonable jury could have concluded that claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent are not invalid.

**B.     BCGI Will Be Irreparably Harmed Unless Its Requested Relief Is Granted**

The verdict itself, and the injunction's prohibition against continuing to supply services to its codefendant carriers, have left BCGI in an extremely tenuous

17

financial position. Ex. 27 (Affidavit of E. Snowden), ¶¶ 3-5. However, BCGI's very survival hinges on the present motion succeeding. Since most of BCGI's remaining revenues are derived from the services it performs for non-defendant carriers, BCGI *cannot survive as a going concern* unless either the injunction is construed not to apply to non-defendant carriers or, to the extent it does cover them, the injunction is stayed during BCGI's appeal. *Id.*, ¶¶ 5-6.

### C.     Freedom Will Not Be Harmed If BCGI's Requested Relief Is Granted

On the other hand, even if the Court were to conclude that the injunction properly extends to reach services provided to non-defendant carriers, permitting BCGI to continue to provide those services pending appeal would have no negative consequences for Freedom. Freedom offers no services and sells no products in the prepaid wireless marketplace. As a result, Freedom does not seek to exclude others from the marketplace. Instead, licensing is its business. Indeed, the record is clear that Freedom is willing to license its patents—and at rates much lower than the 2.5 cents per minute that the district court imposed in the injunction (which appears to have been based on the jury award). Ex. 28 (Cavalieri Decl.); Ex. 29 (Johnson Decl.); Ex. 30 (Walker Affidavit).[5]

---

[5] The 2.5 cents rate was calculated based on the activities (and profits) of the defendant carriers, including (in particular) Cingular, during a time period that is no longer relevant. *See* Ex. 20 at 184-89, 193-94. The rate has no evidentiary connection to the non-defendant carriers (Nextel and Alltel). Moreover, wireless services, including prepaid services, are much less expensive than in the past (*see* Ex. 31 (Mar. 30, 2005 Trial Tr.) at 5), and the non-defendant carriers began utilizing BCGI's services later than Cingular did (*see* Ex. 32 (Nextel's Motion for Clarification or Stay) at 3).

Here, therefore, even if Freedom prevails in this appeal and ultimately establishes (in the other pending cases) that BCGI and the non-defendant carriers jointly infringe the Freedom patents, Freedom will have suffered no harm because it can be adequately compensated by money damages. BCGI's economic situation is perilous, but Freedom has never argued (nor could it) that the non-defendant carriers—industry giants Nextel and Alltel—would not be able to satisfy whatever judgments were ultimately entered against them in those cases.

In short, therefore, this factor strongly supports a stay, especially when the lack of harm to Freedom is compared to the harm that BCGI will suffer if it were prevented from providing services to non-defendant carriers. *See E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 279 (Fed. Cir. 1987).

But even if this Court were to disagree, and conclude that Freedom needs some additional assurance that it will be compensated in the event that the non-defendants are later determined to be infringers, the Court could order BCGI to establish an escrow fund for Freedom's benefit. In that event, BCGI suggests that the Court require it to make escrow payments at a rate not greater than 0.16 cents per minute. This rate would be consistent with the license Freedom recently granted to Convergys. *See* Ex. 30, ¶ 4; Ex. 28, ¶ 3. Moreover, given the economics of the situation, this rate would be the largest payment BCGI could make without being driven into bankruptcy. *See* Ex. 27, ¶¶ 7-9.

**D.    The Public Will Be Harmed If a Stay Is Not Granted**

BCGI services approximately 10 million prepaid wireless calls per day (*see* Ex. 34 (March 9, 2005 Trial Tr.); and many subscribers who use prepaid wireless

19

services do so because they cannot afford, or do not have good enough credit to qualify for, a monthly billing plan. The public interest, therefore, supports a stay. If the injunction were construed to extend to services involving non-defendant carriers (and not stayed), those wireless carriers would have to seek an alternative vendor for prepaid wireless services for their customers. This would mean that millions of subscribers who are among the most vulnerable members of society would be put to the burden of changing cell plans or losing service—service that plays a crucial role in public safety. *See* Ex. 27, ¶¶ 10-13; Ex. 33 (Affidavit of S. Largent), ¶¶ 6-14.

## V.   CONCLUSION

For the foregoing reasons, BCGI respectfully requests that this Court either (1) construe the district court's injunction not to apply to non-defendant carriers, or (2) to the extent it does cover non-defendant carriers, stay the injunction pending resolution of BCGI's appeal. Further, to preserve the status quo, BCGI asks the Court to issue a temporary stay to last only until the Court has had the opportunity to rule on this motion.

Dated: November 14, 2005

*Donald R. Dunner/dob*

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
Telephone: (202) 408-4000

20

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
Telephone:  (650) 849-6600

*Attorneys for Defendant/Counterclaimant-
Appellee Boston Communications Group, Inc.*

21

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## FREEDOM WIRELESS v. BOSTON COMM

### No. 06-1020

### <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Boston Communications Group, Inc. certify the following:

1. The full name of every party or amicus represented by us is:

   Boston Communications Group, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   Not applicable.

3. All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by us are:

   No publicly held company owns 10% or more of the stock of Boston Communications Group, Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Donald R. Dunner
   Don O. Burley
   FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
   901 New York Avenue, NW
   Washington, DC  20001-4413
   (202) 408-4000

1

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
(650) 849-6600

Michael B. Keating
Philip C. Swain
Vickie L. Henry
FOLEY HOAG, L.L.P.
155 Seaport Boulevard
Boston, MA  02110
(617) 832-1000

Paul J. Hayes
Patrick Sharkey
Dean Bostock
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Kirk A. Damman
LEWIS RICE & FINGERSH, LLC
500 North Broadway Suite 2000
St Louis, MO  63102
(314) 444-7783

Todd E. Thompson
Simon J. Frankel
Howard Rice Nemerovski
CANADY FALK & RABKIN, P.C.
Three Embarcadero
Seventh Floor
San Francisco, CA  94111
(415) 434-1600

2

**CERTIFICATE OF SERVICE**

I hereby certify that two copies of the foregoing EMERGENCY MOTION

OF BOSTON COMMUNICATIONS GROUP, INC. TO CONSTRUE OR STAY

THE DISTRICT COURT'S INJUNCTION were served by Federal Express on this

14th day of November, 2005, on the following counsel of record:

> Marshall M. Searcy III
> QUINN EMANUEL URQUHART
>   OLIVER & HEDGES, LLP
> 865 South Figueroa Street, 10th Floor
> Los Angeles, CA  90017