UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FREEDOM WIRELESS, INC.,

            Plaintiff,

        v.

BOSTON COMMUNICATIONS GROUP,
INC., ET AL.,

            Defendants.

CIVIL ACTION No. 05-11062-EFH

## DECLARATION OF JOHN KENNETH FELTER

I, John Kenneth Felter, declare as follows:

(1)     I am a partner at Goodwin Procter LLP, attorneys for Freedom Wireless, Inc. I submit this declaration based on my personal, first-hand knowledge.

(2)     Attached as Exhibit A is a true and correct copy of the Order granting a stay of the Order for Permanent Injunctive Relief Pursuant to 35 U.S. C. § 283 entered in C.A. No. 00-12234-EFH issued by the United States Court of Appeals for the Federal Circuit (Nos. 06-1020, -1078, -1079, -1098, -1099) on December 15, 2005.

(3)     Attached as Exhibit B is a true and correct copy of the Emergency Motion of Boston Communications Group, Inc. to Construe or Stay the District Court's Injunction filed in the United States Court of Appeals for the Federal Circuit (No. 06-1020) on November 14, 2005.

(4)     Attached as Exhibit C is a true and correct copy of the Reply Brief in Support of Emergency Motion of Boston Communications Group, Inc. to Construe or Stay the District

Court's Injunction filed in the United States Court of Appeals for the Federal Circuit (Nos. 06-1020, -1078, -1079) on November 28, 2005.

(5)     Attached as Exhibit D is a true and correct copy of a letter to The Honorable Jan Horbaly, Clerk of Court, United States Court of Appeals for the Federal Circuit, from Donald R. Dunner, counsel for Boston Communications Group, Inc., dated November 28, 2005.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this declaration was executed on January 3, 2006 in Boston, Massachusetts.


/s/ John Kenneth Felter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FREEDOM WIRELESS, INC.,

              Plaintiff,

      v.

BOSTON COMMUNICATIONS GROUP,
INC., ET AL.,

              Defendants.

CIVIL ACTION No. 05-11062-EFH

**EXHIBITS TO**
**OPPOSITION OF FREEDOM WIRELESS, INC. TO DEFENDANT**
**BOSTON COMMUNICATIONS GROUP, INC.'S REQUEST FOR**
**RECONSIDERATION OF THE DENIAL OF ITS MOTION FOR A STAY**

# EXHIBIT A

NOTE: Pursuant to Fed. Cir. R. 47.6, this order
is not citable as precedent.  It is a public order.

# United States Court of Appeals for the Federal Circuit

06-1020, -1078, -1079, -1098, -1099

FREEDOM WIRELESS, INC.,

Plaintiff-Cross Appellant,

v.

BOSTON COMMUNICATIONS GROUP, INC.,

Defendant-Appellant,

and

WESTERN WIRELESS CORPORATION (d/b/a Cellular One),

Defendant-Appellant,

and

AT&T WIRELESS PCS, CINGULAR WIRELESS LLC, and CMT PARTNERS
(d/b/a Cellular One of San Francisco),

Defendants-Appellants,

and

NEXTEL COMMUNICATIONS, INC. and NEXTEL OPERATIONS, INC.
(now known as Sprint Nextel Corporation),

Movants-Appellants,

v.

ROGERS WIRELESS, INC. (a/k/a Rogers AT&T Wireless),

Defendant-Appellee.

ON MOTION

Before MICHEL, <u>Chief Judge</u>, BRYSON and GAJARSA, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

## O R D E R

Nextel Communications, Inc. and Nextel Operations, Inc. (collectively Nextel) move for leave to intervene in the appellants' and cross-appellant's appeals. Nextel moves for a stay, pending appeal, of the injunction issued by the United States District Court for the District of Massachusetts to the extent that it reaches Nextel. Boston Communications Group, Inc. (BCGI) moves to construe the injunction not to apply to non-defendants or, if it does, to stay the injunction, pending appeal. Cingular Wireless, LLC, AT&T Wireless, and CMT Partners (collectively Cingular) move for a stay, pending appeal, of the injunction as it applies to them. Freedom Wireless, Inc. opposes the motions. Nextel, BCGI, and Cingular move for leave to file replies, with replies attached. Freedom Wireless does not oppose the motions for leave to file replies.

## BACKGROUND

Freedom Wireless brought "joint infringement" claims against BCGI and Cingular Wireless LLC jointly; BCGI and AT&T Wireless PCS jointly; BCGI and CMT Partners jointly; and BCGI and Western Wireless Corporation jointly. Per the jury instruction, joint infringement was defined as:

> if separate companies work together to perform all of the steps of a claim of a patent, the companies are jointly responsible, that is, responsible as a group for the infringement of the patent. Even if no single company performs all of the steps of a claim, the companies are jointly responsible.

The district court explicitly held that contributory infringement and inducement were not applicable and those theories were not presented to the jury. The jury returned four

verdicts finding that each of the four pairings jointly infringed the patents in suit literally and under the doctrine of equivalents.

Before trial, the district court held that Freedom Wireless, if it wished to pursue claims against non-defendant carriers, must do so in separate actions.  Freedom Wireless filed separate follow-up actions, against BCGI and Nextel jointly and against BCGI and Alltel Corporation jointly.  Those actions are pending in the district court. Apparently there is also a third action against BCGI and Cincinnati Bell, Inc.

Following the jury verdicts in this case, Freedom Wireless provided the district court with a proposed injunction.  BCGI complained that the language was too broad and could be construed to cover BCGI's activities with the so-called "non-defendant carriers" who were not parties in the case.  The district court's injunction enjoined those "acting in concert with any third party, other than a licensee of Freedom Wireless, Inc. to make, use, sell, or offer to sell any of these implementations, or any systems that are not colorably different."   Shortly thereafter, counsel for Freedom Wireless, Quinn Emanuel Urquhart, issued a press release stating that the injunction prohibits "BCGI and its current carrier customers, including Alltel and Cincinnati Bell, Inc. (CBB), which were named in a recent patent infringement suit by Freedom Wireless, from selling prepaid wireless services using the infringing BCGI systems."

Nextel immediately moved for leave to intervene in the district court for the purpose of clarifying, staying, or amending the injunction and to disqualify Quinn Emanuel based on Quinn Emanuel's concurrent representation of Freedom Wireless and Nextel (in other patent litigation).  The district court denied Nextel's motion for leave

to intervene without stating any reasons.  Nextel appealed the denial of its motion for

leave to intervene and the denial of BCGI's motion to clarify or stay the injunction.

### NEXTEL'S MOTION FOR LEAVE TO INTERVENE

Nextel contends that its application is timely because it was filed only one week

after the Injunction Order was entered.  Freedom Wireless responds that Nextel has

been aware of Freedom Wireless's suit against BCGI since 2002, and thus "has known

for years that [Nextel's] interests were at risk."  However, there is some indication that

Nextel believed its rights would not be determined in the instant case, but rather in a

separate, subsequent action filed by Freedom Wireless against BCGI and Nextel.

Thus, Nextel was not made aware that its rights were the subject of the instant litigation

until the Injunction Order was entered.  Accordingly, Nextel filed its application in a

timely manner.

Nextel also states that it has a direct interest in the injunction because the

injunction "may be construed to bar the continued relationship of BCGI and Nextel."

Nextel points out that it relies upon BCGI's services to run its prepaid wireless phone

service, and that the injunction could "seriously impact Nextel's ability to offer prepaid

wireless phone calls."  Thus, it appears that Nextel has a legally protectable interest

relating to the injunction and that the disposition of this appeal may impair Nextel's

ability to protect its interest.

Nextel further argues that its interests cannot be adequately represented by

existing parties to the appeal.  Freedom Wireless responds that the interests of Nextel

and BCGI are "perfectly aligned."  However, Nextel points out that BCGI's interests in

this appeal are much broader than Nextel's.  According to Nextel, BCGI may devote the

bulk of its efforts on appeal to issues of infringement and invalidity, rather than the scope of the injunction. Furthermore, Nextel contends that BCGI's financial interests may not coincide with its own because BCGI may wish to settle, while Nextel seeks continued litigation. Because Nextel and BCGI are separate businesses with potentially divergent objectives on appeal, we are satisfied that Nextel has shown that its interests will not be adequately represented by an existing party. Accordingly, the court grants Nextel's motion for leave to intervene.

## THE PARTIES' MOTIONS TO STAY THE INJUNCTION

We turn to the parties' motions for a stay, pending appeal, of the injunction. For ease of reference and because BCGI is connected to each of the movants as a joint infringer or putative joint infringer, we refer primarily for purposes of this discussion to BCGI's arguments. At issue is whether BCGI has shown a likelihood of success or presented a substantial question regarding joint infringement, an argument common to all the motions for a stay, and whether the other injunction factors tip in its favor.

In deciding whether to grant a stay, pending appeal, this court "assesses the movant's chances of success on the merits and weighs the equities as they affect the parties and the public." E. I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 835 F.2d 277, 278 (Fed. Cir. 1987). See also Standard Havens Prods. v. Gencor Indus., 897 F.2d 511 (Fed. Cir. 1990). The factors regulating issuance of a stay are (1) whether the movant has made a strong argument that it is likely to succeed on the merits, (2) whether movant will be irreparably harmed absent a stay, (3) whether issuance of a stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies. Hilton v. Braunskill, 481 U.S. 770, 776 (1987). To prevail, a party moving for

a stay pending appeal must establish a strong likelihood of success on the merits or,
failing that, must show that it has a substantial case on the merits and that the harm
factors militate in its favor.  Hilton, 481 U.S. at 778.

> BCGI argues that the
>
> judgment of infringement in this case rests entirely on Freedom's theory,
> adopted by the district court in its jury instructions, that there could be joint
> direct infringement even without a showing that BCGI controlled the actions
> of a carrier defendant (or vice versa).   That is, it is enough (following
> Freedom's joint infringement theory) if one party performs some of a claim's
> steps and a second party performs the remaining claims.   This Court,
> however, has never directly addressed whether such a "joint infringement"
> theory exists, much less adopted the theory.

BCGI points to the court's language in Cross Medical Products, Inc. v. Medtronic Sofamor
Danek, Inc., 424 F.3d 1293 (Fed. Cir. 2005), rejecting the patentee's argument that the
actions of surgeons could be joined with those of the defendant medical device
manufacturer to establish direct infringement, observing that no agency relationship
existed among the surgeons and the manufacturer.  In response, Freedom Wireless
argues that the theory of liability based on joint infringement existed before the 1952
Patent Act, remains viable today, and cannot be limited to "control" of one party by
another.  Freedom Wireless points to four district court cases that have embraced the
theory of joint infringement.

The question of the viability and scope of the theory of joint infringement is an
issue that will benefit from full briefing by the parties in this appeal.  This motions panel
thus declines to delve into the issue in any depth.  However, we conclude that BCGI has
demonstrated the existence of a substantial question whether the theory of liability
applied in the district court departs from this court's precedents regarding vicarious liability
for infringement in such a manner as to bring the verdict into question.  This court has not

directly addressed the theory of joint infringement and there is relatively little precedent on that issue.

With respect to the balance of harms, BCGI states that the injunction against continuing to supply services to its co-defendant carriers has left it "in an extremely tenuous financial position" and that its "survival hinges on the present motion succeeding," if the injunction applies to Nextel and BCGI's other non-defendant carriers. Nextel states that it uses BCGI's services for all its prepaid wireless customers in the United States. Cingular states that it is working to migrate its customers to other prepaid systems, but that its remaining customers will be harmed unless the injunction is stayed.

With respect to harm to Freedom Wireless, BCGI states that Freedom Wireless does not offer or sell prepaid services in the prepaid wireless market and can be compensated by money damages if it prevails on appeal. See DuPont, 835 F.2d at 278-79 (noting the comparative lack of harm to DuPont because DuPont did not practice the invention and never sought to exclude others from the market). With respect to the public interest, BCGI states that millions of subscribers will either be burdened with having to change service providers or be at risk of losing wireless service.

## CONCLUSION

In view of the above, we conclude that the appellants have shown that a substantial question exists regarding the theory of joint infringement and that the balance of harm tips in their favor. Accordingly, a stay of the injunction is warranted.

IT IS ORDERED THAT:

(1)     Nextel's motion for leave to intervene on appeal is granted.

(2)    The motions for a stay of the injunction, pending appeal, are granted.

(3)    The motions for leave to file replies are granted.

FOR THE COURT

DEC 15 2005
_____
Date

William C. Bryson
Circuit Judge

cc:    Marshall M. Searcy, III, Esq.
       Donald Dunner, Esq.
       Claudia Wilson Frost, Esq.
       Richard McMillan, Jr., Esq.
       Mark D. Wegener, Esq.
       Vickie L. Henry, Esq.

s5

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

DEC 15 2005

JAN HORBALY
CLERK

06-1020 et al.                                    8

# EXHIBIT B

06-1020

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

FREEDOM WIRELESS, INC.,

*Plaintiff/Counterclaim Defendant-*
*Appellant,*

v.

BOSTON COMMUNICATIONS GROUP, INC.,

*Defendant/Counterclaimant-*
*Appellee, et al.*

EMERGENCY MOTION OF BOSTON COMMUNICATIONS GROUP, INC.
TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue
Washington, DC  20001-4413
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
(650) 849-6600

*Attorneys for Defendant/Counterclaimant-*
*Appellee Boston Communications Group, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.      STATUS OF MATTER.......................................................................................... 1

II.     PRELIMINARY STATEMENT ........................................................................... 2

III.    STATEMENT OF FACTS .................................................................................... 4

        A.      The Patents in Suit ..................................................................................... 4

                1.      The Required Step of "Directly" Connecting Calls from the
                        Prepaid System to the LEC............................................................. 5

                2.      The Required "Periodic Validation" Accounting Method............................ 5

        B.      BCGI's Prepaid Service Bureau ................................................................ 7

        C.      The CSI Prior Art...................................................................................... 9

        D.      The Jury's Verdict................................................................................... 11

IV.     ARGUMENT ...................................................................................................... 12

        A.      BCGI's Appeal Will Likely Succeed...................................................... 12

                1.      The Injunction Is Impermissibly Broad ...................................... 12

                2.      The District Court Erroneously Instructed the Jury on Joint
                        Infringement................................................................................. 13

                3.      No Reasonable Jury Could Conclude That the Defendants Infringe
                        the 17 "Direct Connection" Claims Under the Doctrine of
                        Equivalents................................................................................... 15

                4.      No Reasonable Jury Could Conclude That BCGI's Service Bureau
                        Performs "Periodic Validation" .................................................. 16

                5.      The Remaining Claims Are Invalid ............................................ 16

        B.      BCGI Will Be Irreparably Harmed Unless Its Requested Relief Is Granted........ 17

        C.      Freedom Will Not Be Harmed If BCGI's Requested Relief Is Granted............... 18

        D.      The Public Will Be Harmed If a Stay Is Not Granted ........................................ 19

V.      CONCLUSION.................................................................................................... 20

i

# TABLE OF AUTHORITIES

## Cases

*Advanced Display Sys. v. Kent State Univ.*,
    212 F.3d 1272 (Fed. Cir. 2000) ............................................................................ 17

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005) ............................................................................ 14

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
    424 F.3d 1168 (Fed. Cir. 2005) ............................................................................ 16

*E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*,
    835 F.2d 277 (Fed. Cir. 1987) .............................................................................. 19

*Int'l Rectifier Corp. v. IXYS Corp.*,
    383 F.3d 1312 (Fed. Cir. 2004) ............................................................................ 13

*J & M Corp. v. Harley-Davidson, Inc.*,
    269 F.3d 1360 (Fed. Cir. 2001) ............................................................................ 15

*KSM Fastening Sys. v. H.A. Jones Co., Inc.*,
    776 F.2d 1522 (Fed. Cir. 1985) ............................................................................ 13

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ............................................................................ 16

*Seachange Int'l, Inc. v. C-Cor Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) ............................................................................ 15

*Searfoss v. Pioneer Consol. Corp.*,
    374 F.3d 1142 (Fed. Cir. 2004) ............................................................................ 15

*Standard Havens Prod., Inc. v. Gencor Indus., Inc.*,
    897 F.2d 511 (Fed. Cir. 1990) .............................................................................. 12

## Other Authorities

Mark A. Lemley, et al., *Divided Infringement Claims*,
    33(3) AIPLA Q.J. 255 (2005) ............................................................................... 14

## I.  STATUS OF MATTER

Boston Communications Group, Inc. ("BCGI") provides accounting-related services (principally call rating and debiting services) in connection with prepaid wireless (cellular) telephone calls.  BCGI provides its services (called a "service bureau") to a number of wireless carriers, including its codefendant carriers.

Following a jury verdict that BCGI and its codefendant carriers "jointly" infringed the .'067 and '823 patents owned by Freedom Wireless, Inc. ("Freedom"), the district court denied BCGI's JMOL motions and entered a permanent injunction.  Ex. 1 (Oct. 17, 2005 Order for Permanent Injunctive Relief).[1]  Freedom has stated that the injunction extends beyond the activities of BCGI and its codefendants, and prohibits BCGI from acting in concert with *any* third party to provide prepaid wireless services.  Ex. 2 (Freedom Press Release).  On November 9, 2005, the district court—without opinion—denied BCGI's motion for clarification or stay, in which BCGI asked the court either to clarify that its injunction did not apply to non-defendant carriers or, if it did, to stay that aspect of its injunction pending appeal.  Further, while BCGI made a fallback request asking the court at least to grant a temporary stay for two weeks (to give BCGI time to seek a stay pending appeal from this Court), in denying BCGI's motion, the district court said nothing about that request.

---

[1] BCGI filed a notice of appeal on October 20, 2005.  Due to administrative delays at the district court, however, BCGI's appeal has not yet been docketed in this Court.  Accordingly, BCGI is filing this motion in Freedom's appeal from the same case below.

1

BCGI therefore requests that this Court either (1) construe the district court's injunction not to apply to non-defendant carriers, or (2) to the extent it does cover non-defendant carriers, stay the injunction pending resolution of BCGI's appeal. BCGI does not seek to stay the injunction as it applies to the defendant carriers. Further, to preserve the status quo, BCGI asks the Court to issue a temporary stay to last only until the Court rules on this motion. BCGI has discussed this motion with the other parties to this appeal. Freedom objects and intends to respond.

## II.    PRELIMINARY STATEMENT

If Freedom's interpretation of the injunction is correct, it is a death warrant for BCGI. Freedom's interpretation goes far beyond the jury verdict, which found that each carrier defendant and BCGI jointly infringe Freedom's two patents. Indeed, the verdict was expressly limited to the *combined* activities of BCGI and each carrier defendant, and was based on evidence that was specific to each carrier's use of BCGI's service bureau. In fact, the carrier-specific nature of Freedom's allegations had previously led the district court to rule that whether the patents are jointly infringed by BCGI and other, *non-defendant* carriers—whose activities are now at issue in *other* cases that Freedom filed—is beyond the scope of this case.

Unless the injunction is construed not to cover non-defendant carriers, or is stayed to the extent it does, BCGI is unlikely to survive to see this Court's decision on the merits. And the merits of BCGI's appeal are substantial. For example, while this Court has never directly decided the issue, it has suggested that an agency or similar control relationship would be required if the activities of two

parties were to be combined to prove direct infringement. The district court, however, imposed no such requirement in this case.

Further, the district court failed to enforce two clear estoppels that mandate a judgment of non-infringement on all but five claims. First, the district court expressly found that Freedom had disclaimed (both in the specification and during prosecution) anything other than a direct connection between two claimed components, yet permitted the jury to find that the defendants, who (at most) connect those two components indirectly, infringed the relevant claims under the doctrine of equivalents. Second, the district court found that the "periodic validation" accounting method described in Freedom's patents was an "important" part of the claimed invention and interpreted every claim with an accounting step to require periodic validation. Yet, even though BCGI uses an accounting method of the precise type that Freedom criticized and distinguished from its own method of "periodic validation," the district court let the jury's infringement verdict on these claims stand.

The remaining five claims, which deal with very basic methods of call forwarding and verification (but not periodic validation), are anticipated by a prior art system described in a publicly available brief and supporting testimony filed in a California administrative proceeding. BCGI's expert provided a detailed explanation of that documentation and how it taught every element of the five remaining claims. Notably, Freedom never offered an expert or other evidence to challenge BCGI's evidence. Instead, Freedom relied only on the arguments of its

3

attorney, who focused on irrelevancies such as limitations that were in *other* claims or whether the prior art included flow-charts.

BCGI has the right to ask this Court to redress these (and other) errors. That right, however, is of no value to BCGI if it goes bankrupt during this appeal. Accordingly, BCGI respectfully requests that this Court stay the district court's injunction during the pendency of this appeal, but only as it concerns BCGI's activities with non-defendant carriers.

## III.  STATEMENT OF FACTS

### A.  The Patents in Suit

The '067 and '823 patents (Exs. 3 and 4) share a common specification (all specification cites are to the '823 patent) and are directed to a prepaid service that interfaces with a conventional wireless telecommunications system. Figure 1 "generally describe[s] the system of the present invention." Ex. 4 at 5:5-8. In this system, a phone call is received at a wireless carrier's Mobile Telephone Switching Office ("MTSO") (8) via cell tower (4). *Id.* at 3:55-61. The MTSO then determines whether the caller is a prepaid subscriber. *Id.* at 5:28-35. If not, the call is forwarded, in the conventional manner, from the MTSO to the Local Exchange Carrier ("LEC") (20), which completes the call. *Id.* at 5:17-21. If the subscriber is prepaid, however, the MTSO forwards the call to prepaid service provider (10) having a host computer (16), which validates the account and then, assuming the account is valid, forwards the call *directly to* the LEC. *Id.* at 5:25-35; 5:66-6:10.

4

**1.    The Required Step of "Directly" Connecting Calls
from the Prepaid System to the LEC**

A prepaid service provider/host computer that connects prepaid calls to the LEC is an important part of the invention. The service provider of "the invention" is repeatedly described as being responsible for directing prepaid calls to the LEC (*see id.* at 4:15-19; 6:8-10; 8:17-21), and Freedom repeatedly emphasized its importance while prosecuting claims that recited a "pre-paid switching system." *See* Ex. 5 (Nov. 25, 1996 Amend.) at 2, 4-5; Ex. 6 (Mar. 26, 1997 Amend.) at 6-7; Ex. 7 (Mar. 14, 1997 facsimile) at 2.

Indeed, so important is this method of connecting calls to the invention that the district court expressly found that Freedom had disclaimed anything other than a direct connection between the LEC and the prepaid system for any claim reciting a "pre-paid switching system" or requiring the prepaid system to connect the call. Ex. 8 (Apr. 23, 2003 Claim Construction Order) at 14, 16. This disclaimer is reflected in the district court's construction of 17 of the 32 asserted claims: '067 patent claims 10-14, 16, and 18; and '823 patent claims 29-31, 34, 36, 39, 42, 53, 57, and 59. *See* Ex. 9 (claim construction submitted to jury).

**2.    The Required "Periodic Validation" Accounting
Method**

The specification also describes a "periodic validation" accounting method. *See* Ex. 4, Fig. 7; 8:33-9:15. This method periodically validates the account and "decrements" (deducts from) the subscriber's account balance *while the call is in progress.* *Id.* at 4:20-25. While money can be directly taken from the account, in the preferred embodiment the account balance is converted into a time value that is

5

based on, for example, the time of day, the number being called, etc. *Id.* at 8:38-56. As the call progresses, the account balance is periodically reduced in intervals that correspond to minimum billing increments of currency or time. *Id.*

The periodic validation of the account using the "time value" embodiment is illustrated in the flow chart of Fig. 7. As shown in block 132 of that figure, the periodic validation is set to occur every minute (although it could be set for other billing increments (*see id.* at 8:42-43)). Accordingly, each time a minute elapses in the computer's timer, another validation request is made of the account until the account lacks sufficient funds for another billing increment and the call is disconnected. *See id.* at 8:57-67; Fig. 7 (loop 128-32).

The patent's "Summary of the Invention" emphasizes periodic validation, stating that "[i]t is important to note the time value is deducted from the account balance at regular intervals of time while the call is in progress" and that the amount deducted is "based upon elapse of pre-determined time periods at the predetermined time value for cellular telecommunications." *Id.* at 4:20-25.

The specification also contrasts "periodic validation" with a prior art method, typified by the prior art "D'Urso telecommunications system," that calculates a maximum call duration at the beginning of the call based on the account balance that was available before the call began and then sets an alarm or timer using the computer's internal clock. *See id.* at 3:15-35. The specification stresses the significance of the difference between "periodic validation" and alarm-based systems, like D'Urso, that update the balance after a call has ended. For example, immediately after describing the call accounting feature of D'Urso, the

6

specification states that its invention "is fundamentally different" from D'Urso. *Id.* at 3:36-40.  Freedom also distinguished D'Urso from the invention on this basis during prosecution, arguing that a limitation reciting "decrementing the subscriber account balance at regular intervals during the telecommunications event" was "not disclosed or suggested by" D'Urso. Ex. 10 (Jun. 17, 1996 Amend.) at 6, 12.

In construing the claims that recited some kind of accounting, the district court recognized that Freedom described validation at regular intervals as an "'important' part of the invention." Ex. 8 at 34  It therefore construed claims 10-14 and 16-18 of the '067 patent and claims 2-3, 5, 9, 11, 12, 15, 17, 19, 20, 29-31, 34, 36, 39, 42, 53, 57, and 59 of the '823 patent accordingly. *See* Ex. 9.

### B.     BCGI's Prepaid Service Bureau

Three implementations of BCGI's service bureau are at issue in Freedom's suit: the Multi-Frequency ("MF") implementation, the SS7 implementation, and the Pre-IN implementation. Ex. 11 (Mar. 11, 2005 Trial Tr.) at 77-79.  However, BCGI does not use these implementations to provide prepaid wireless services to cellular subscribers.   Rather, it is the wireless carriers that interface with subscribers using their own networks.   For example, the wireless carriers' equipment determines that a call is from a prepaid wireless subscriber; if it is, information about the subscriber and the call is sent to BCGI's service bureau. Ex. 12 (Apr. 13, 2005 Trial Tr.) at 43-45.

In the MF implementation, for example, the carrier's MTSO (labeled "switch" in the figure below) transfers the call to the BCGI "Node," a computer that is physically located near the MTSO (*id.* at 45):

7



The Node then passes subscriber and call information to a central computer, called a "Responder," located in one of BCGI's Massachusetts facilities. *Id.* The Responder calculates the maximum duration of the call based on the balance available in the subscriber's account and sends that information back to the Node, which—as in the D'Urso prior art system—sets an alarm. *Id.* at 45-46. At that point, the Node sends the call back to the MTSO, which then completes the call by, for example, forwarding it to an LEC. *Id.* at 47. Since the carrier's MTSO is responsible for completing the call, no component of the BCGI service bureau connects the call to the LEC. *Id.* If the maximum call duration is reached, the alarm goes off and the call is disconnected. *Id.* at 65-66. Upon termination of the call (either because one party hangs up or the maximum call duration is reached), the Node informs the Responder of the end time of the call and the Responder re-calculates the available balance in the subscriber's account. *Id.* Thus, the BCGI service bureau—again like D'Urso—is incapable of updating a subscriber's account while a call is in progress. *Id.* at 72-74.

The SS7 and Pre-IN implementations similarly do not directly connect calls to an LEC. *Id.* at 78, 87-88, 95; *see also* Ex. 13 (Mar. 14, 2005 Trial Tr.) at 125. Likewise, both the SS7 and Pre-IN implementations calculate the maximum call

duration before the call begins and set an ordinary computer clock alarm. Ex. 12 at 88, 94; Ex. 13 at 81; Ex. 14 (Mar. 15, 2005 Trial Tr.) at 34.[2]

### C.    The CSI Prior Art

In November 1991, Cellular Service, Inc. ("CSI") filed a proposal with the California Public Utilities Commission ("CPUC") requesting it to order wireless carriers doing business in California to allow CSI to connect its own system to the carriers' switches (MTSOs). Ex. 15 (Opening Brief of Cellular Service, Inc.) at 3-8. CSI's proposal included a brief (Ex. 15) and supporting testimony, including the written testimony of Donald Raney (Ex. 16), Harry Midgley (Ex. 17), and Ralph Widmar (Ex. 18), that were available to the public as of the brief's filing in the CPUC on November 7, 1991. (*See* date stamp on Ex. 15.) Freedom's first patent application was filed more than three years later (on December 23, 1994).

The CSI brief generally describes the CSI system and the services that CSI intended to provide with it, specifically citing the written testimony that CSI presented to the CPUC. Ex. 15 at 2. These materials were discussed at trial by BCGI's expert (Professor Wicker), who testified that the CSI proposal anticipates claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. These five claims, unlike the other asserted claims, do not require "periodic validation" or a direct connection between the prepaid service and LEC. Ex. 9. Instead, they describe only very basic methods of forwarding a prepaid call to a prepaid service

---

[2]    Although there are significant differences among the various BCGI implementations that affect some of BCGI's other non-infringement defenses, the characteristics described in this motion that should have led to a finding of non-infringement are shared by every implementation.

9

provider that (in claims 1, 27, and 28 only) performs a simple verification of a valid account. Professor Wicker explained how the CSI proposal anticipated all of these claims. Ex. 12 at 17-19; Ex. 19 (Apr. 12, 2005 Trial Tr.) at 121-122.

For example, the CSI proposal (in Widmar's testimony) describes a host of services that CSI intended to provide, including prepaid service. Ex. 18 at 8 ("[c]ustomers who present credit risks could be required to pre-pay for service"). Moreover, the proposal (in Midgley's testimony) set out in great detail the technology that made CSI's services possible. Ex. 17 at 1-22. And Professor Wicker explained to the jury where Midgley described how the MTSO would forward the calls of CSI's customers (including prepaid subscribers) to CSI's system, which also verifies the prepaid subscriber's account. Ex. 19 at 48-52. Professor Wicker concluded that the CSI proposal anticipates claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. Ex. 19 at 101-106, 121-122; Ex. 12 at 17-19.

Freedom offered no competing evidence. Instead, Freedom's counsel personally attacked Professor Wicker and argued his testimony should be disregarded because (1) the CSI proposal failed to describe either periodic validation or cutting off a call when funds run out (Ex. 20 (May 11, 2005 Trial Tr.) at 175), notwithstanding that numerous claims (including the five discussed here) did not include those limitations; (2) the CSI documentation mentioned prepaid service just once (*id.* at 126-127, 174-175); (3) there were no flowcharts in the CSI materials (*id.* at 175); and (4) Professor Wicker relied on numerous documents (the

10

CSI brief and supporting affidavits), but anticipation requires all claim elements to be present in a single document (Ex. 21 (Apr. 15, 2005 Trial Tr.) at 101-106).

**D.    The Jury's Verdict**

Because neither BCGI alone nor the carriers alone performed every step of any claim, Freedom asserted, and the district court agreed, that the jury could combine the actions of BCGI and the defendant carriers to find direct infringement. Ex. 22 (jury verdict forms). However, the district court refused to allow Freedom to assert that BCGI's use of its service bureau for other, non-defendant carriers constituted infringement (Ex. 23 (Order dated April 27, 2005) at 1), explaining that the non-defendant carriers' conduct was not part of this case and that Freedom would have to file separate actions to "pursue claims arising from conduct involving non-defendant carriers" (*id.* at 2), which Freedom has now done (Exs. 24 and 25 (*Freedom v. Alltel/BCGI* and *Nextel/BCGI* complaints)). Accordingly, the jury considered only the activities of BCGI and the carrier defendants. Ex. 22.

The jury found joint infringement of the asserted claims by BCGI and the carriers, but did so following improper, overbroad instructions to which BCGI had objected. Specifically, after the district court rejected BCGI's arguments that joint infringement can occur, if at all, only where one party controls the actions of the other (such as where there is an agency relationship), the jury was instructed that Freedom need only prove that BCGI and the carriers "work together to perform all of the steps of a claim." Ex. 26 at 9-10.

Further, notwithstanding that every implementation of the BCGI system lacks a direct connection to the LEC, the jury concluded that the "direct

11

connection" claims were nevertheless infringed under the doctrine of equivalents. The jury also found that the defendants infringed all of the "periodic validation" claims, even though, like D'Urso, BCGI uses an alarm and deducts from the subscriber's account balance only after a call ends. *See* pages 8-9 *supra*.

Finally, the jury found that BCGI did not prove that claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent were anticipated, notwithstanding BCGI's uncontested evidence that every feature of those claims could be found in the CSI proposal.

## IV.  ARGUMENT

Whether an injunction should be stayed pending appeal involves four considerations: (1) likelihood of success on the merits, (2) irreparable harm to the moving party; (3) substantial harm to the non-moving party; and (4) the public interest. *Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). Where the harm resulting from denial of the stay is considerable, however, a lesser showing is required regarding likelihood of success. All that is required is that the moving party raise a substantial issue. *Id.* at 513.

### A.    BCGI's Appeal Will Likely Succeed

#### 1.    The Injunction Is Impermissibly Broad

Freedom insists the injunction against BCGI's use of its service bureau for non-defendant carriers extends the jury's verdict in this case to cover the activities of non-parties, including those that are currently the subject of separate, pending litigations where the issues of infringement, validity, and enforceability are contested. That cannot be correct. There is no evidence in the record that any

12

alleged conduct of BCGI and the non-defendant carriers constitutes joint infringement, even under the district court's erroneous instructions, or that it is "not more than colorably different" from the conduct found to infringe. *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) ("[T]he only acts [an] injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices."). In this context, therefore, separate lawsuits (which are now underway) are required to determine whether the joint conduct of other carriers and BCGI infringes, and that conduct cannot be enjoined. *See KSM Fastening Sys. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1531 (Fed. Cir. 1985) (injunction cannot cover activity that requires litigation of "substantial new issues").[3]

### 2.    The District Court Erroneously Instructed the Jury on Joint Infringement

The judgment of infringement in this case rests entirely on Freedom's theory, adopted by the district court in its jury instructions, that there could be joint direct infringement even without a showing that BCGI controlled the actions of a carrier defendant (or vice versa). That is, it is enough (following Freedom's joint infringement theory) if one party performs some of a claim's steps and a second party performs the remaining steps. This Court, however, has never directly addressed whether such a "joint infringement" theory exists, much less adopted the theory. Indeed, if anything, this Court's recent decision in *Cross Medical*

---

[3] Freedom has in fact filed separate lawsuits against other carriers, including intervenor Nextel, which deals with this issue in more detail in its brief. BCGI will not repeat those arguments here, but instead joins Nextel's brief.

13

*Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), suggests that the Court would likely reject the theory. There, the Court rejected the patentee's argument that the actions of surgeons could be joined with those of the defendant medical device manufacturer to establish direct infringement by the manufacturer, observing that no agency relationship existed between the surgeons and the manufacturer. *Id.* at 1311.

Moreover, as Professor Lemley of Stanford Law School recently observed, an "important policy purpose" is served by preventing patentees from pursuing joint infringement theories where different entities separately perform claimed steps without any one of them controlling the actions of the others:

> Direct infringement is a strict-liability offense, but it is limited to actually performing all the steps of a patented process. By contrast, indirect liability requires evidence of "specific intent" to induce infringement, or knowledge that a good is specially adapted for aiding infringement and has no other use. Construing the patent laws to permit the individual, non-infringing acts of unrelated parties together to add up to infringement would render both § 271(b) and § 271(c) meaningless. . . . [O]n a theory of joint infringement, no one need ever sue for inducement.

Mark A. Lemley, et al., *Divided Infringement Claims*, 33 AIPLA Q.J. 255, 261-62 (2005).

Assuming that this Court holds that there is such a thing as joint infringement, but that it requires proof of an agency or similar "control" relationship between the parties, a directed judgment in BCGI's favor would be required because Freedom presented no evidence of such a relationship. Similarly,

14

if this Court were to impose an intent or knowledge requirement, a new trial would be required, since the jury was never instructed that intent or knowledge was needed to establish liability.

### 3. No Reasonable Jury Could Conclude That the Defendants Infringe the 17 "Direct Connection" Claims Under the Doctrine of Equivalents

The district court expressly found during claim construction that Freedom had disclaimed any connection other than a direct one from the prepaid switching system to the LEC. The natural consequence of that finding was that Freedom should have been precluded from proving infringement under the doctrine of equivalents. *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir. 2001) ("Structure expressly disclaimed in the specification, of course, cannot be considered an equivalent under the doctrine of equivalents.").

Further, the "all-elements-rule" prevents a finding that a system, like BCGI's, that does not connect calls directly to an LEC infringes any claim requiring a direct connection. *See, e.g., Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005) (rejecting the argument that "indirect [computer network] interconnections can be equivalent to a network in which every processor is connected to every other processor by direct, point-to-point interconnections" because "such a theory would vitiate the requirement that every processor be connected to every other processor point-to-point"); *see also Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004) ("[W]e must . . . agree with the district court that, 'to find, as [Searfoss] argue[s], that the 'indirect connection'

15

constitutes an equivalent of the direct connection function described in Claim 3 would, in effect, completely vitiate the connection function.'").[4]

### 4. No Reasonable Jury Could Conclude That BCGI's Service Bureau Performs "Periodic Validation"

As a matter of law, none of the "periodic validation" claims can be infringed, either literally or under the doctrine of equivalents, by the defendants. As explained above, Freedom's patent contrasts the invention's accounting method with prior art accounting methods, like the one employed by the D'Urso prior art system, that set an alarm based on a maximum call duration calculated before the call begins. Yet, this is exactly the kind of accounting method employed by BCGI. Therefore, Freedom should have been prevented, as a matter of law, from asserting that the defendants infringe any claim requiring periodic validation. *See Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345-47 (Fed. Cir. 2001) (patentee cannot prove infringement where accused product possesses feature "specifically identified, criticized, and disclaimed" in the specification).

### 5. The Remaining Claims Are Invalid

The only claims not subject to the two non-infringement arguments discussed above are claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. All of the limitations of these claims, however, were described in the

---

[4] Freedom challenged both the "periodic validation" and "direct connection" claim constructions below. Even if it successfully challenged those constructions in this Court, however, this Court could not affirm the judgment. In that situation, BCGI would be entitled to a new trial on invalidity, since the jury was required to apply the correct construction in considering BCGI's invalidity arguments. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1176 (Fed. Cir. 2005).

CSI proposal made more than a year before the Freedom patents were filed. *See* pages 9-10 *supra*. Freedom provided no evidence to rebut Professor Wicker's testimony, and the criticisms of the CSI proposal raised by Freedom's trial counsel are irrelevant (*see* pages 10-11 *supra*) and could not have provided the jury with a legitimate basis for rejecting BCGI's uncontradicted evidence. In particular, the limitations that Freedom's counsel alleged were missing from the CSI proposal (periodic validation and mid-call cut-off) do not appear in these five claims. Moreover, there is no requirement that the prior art include flow charts or mention a concept (prepaid service) multiple times to anticipate.

Similarly irrelevant is Freedom's argument that Professor Wicker relied on multiple documents in putting together his anticipation testimony. The documents Professor Wicker relied on—the CSI brief and supporting testimony—were all part of an integrated document (the brief) and collectively describe different aspects of a single system. The jury was not free to disregard Professor Wicker's analysis simply because it relied on more than one document. *See Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1282-83 (Fed. Cir. 2000) ("Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document.")

In sum, therefore, no reasonable jury could have concluded that claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent are not invalid.

**B.    BCGI Will Be Irreparably Harmed Unless Its Requested Relief Is Granted**

The verdict itself, and the injunction's prohibition against continuing to supply services to its codefendant carriers, have left BCGI in an extremely tenuous

17

financial position. Ex. 27 (Affidavit of E. Snowden), ¶¶ 3-5. However, BCGI's very survival hinges on the present motion succeeding. Since most of BCGI's remaining revenues are derived from the services it performs for non-defendant carriers, BCGI *cannot survive as a going concern* unless either the injunction is construed not to apply to non-defendant carriers or, to the extent it does cover them, the injunction is stayed during BCGI's appeal. *Id.*, ¶¶ 5-6.

### C.  Freedom Will Not Be Harmed If BCGI's Requested Relief Is Granted

On the other hand, even if the Court were to conclude that the injunction properly extends to reach services provided to non-defendant carriers, permitting BCGI to continue to provide those services pending appeal would have no negative consequences for Freedom. Freedom offers no services and sells no products in the prepaid wireless marketplace. As a result, Freedom does not seek to exclude others from the marketplace. Instead, licensing is its business. Indeed, the record is clear that Freedom is willing to license its patents—and at rates much lower than the 2.5 cents per minute that the district court imposed in the injunction (which appears to have been based on the jury award). Ex. 28 (Cavalieri Decl.); Ex. 29 (Johnson Decl.); Ex. 30 (Walker Affidavit).[5]

---

[5] The 2.5 cents rate was calculated based on the activities (and profits) of the defendant carriers, including (in particular) Cingular, during a time period that is no longer relevant. *See* Ex. 20 at 184-89, 193-94. The rate has no evidentiary connection to the non-defendant carriers (Nextel and Alltel). Moreover, wireless services, including prepaid services, are much less expensive than in the past (*see* Ex. 31 (Mar. 30, 2005 Trial Tr.) at 5), and the non-defendant carriers began utilizing BCGI's services later than Cingular did (*see* Ex. 32 (Nextel's Motion for Clarification or Stay) at 3).

Here, therefore, even if Freedom prevails in this appeal and ultimately establishes (in the other pending cases) that BCGI and the non-defendant carriers jointly infringe the Freedom patents, Freedom will have suffered no harm because it can be adequately compensated by money damages. BCGI's economic situation is perilous, but Freedom has never argued (nor could it) that the non-defendant carriers—industry giants Nextel and Alltel—would not be able to satisfy whatever judgments were ultimately entered against them in those cases.

In short, therefore, this factor strongly supports a stay, especially when the lack of harm to Freedom is compared to the harm that BCGI will suffer if it were prevented from providing services to non-defendant carriers. *See E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 279 (Fed. Cir. 1987).

But even if this Court were to disagree, and conclude that Freedom needs some additional assurance that it will be compensated in the event that the non-defendants are later determined to be infringers, the Court could order BCGI to establish an escrow fund for Freedom's benefit. In that event, BCGI suggests that the Court require it to make escrow payments at a rate not greater than 0.16 cents per minute. This rate would be consistent with the license Freedom recently granted to Convergys. *See* Ex. 30, ¶ 4; Ex. 28, ¶ 3. Moreover, given the economics of the situation, this rate would be the largest payment BCGI could make without being driven into bankruptcy. *See* Ex. 27, ¶¶ 7-9.

### D.     The Public Will Be Harmed If a Stay Is Not Granted

BCGI services approximately 10 million prepaid wireless calls per day (*see* Ex. 34 (March 9, 2005 Trial Tr.); and many subscribers who use prepaid wireless

services do so because they cannot afford, or do not have good enough credit to qualify for, a monthly billing plan. The public interest, therefore, supports a stay. If the injunction were construed to extend to services involving non-defendant carriers (and not stayed), those wireless carriers would have to seek an alternative vendor for prepaid wireless services for their customers. This would mean that millions of subscribers who are among the most vulnerable members of society would be put to the burden of changing cell plans or losing service—service that plays a crucial role in public safety. *See* Ex. 27, ¶¶ 10-13; Ex. 33 (Affidavit of S. Largent), ¶¶ 6-14.

## V.    CONCLUSION

For the foregoing reasons, BCGI respectfully requests that this Court either (1) construe the district court's injunction not to apply to non-defendant carriers, or (2) to the extent it does cover non-defendant carriers, stay the injunction pending resolution of BCGI's appeal. Further, to preserve the status quo, BCGI asks the Court to issue a temporary stay to last only until the Court has had the opportunity to rule on this motion.

Dated:  November 14, 2005

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
Telephone:  (202) 408-4000

20

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
Telephone:  (650) 849-6600

*Attorneys for Defendant/Counterclaimant-*
*Appellee Boston Communications Group, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## FREEDOM WIRELESS v. BOSTON COMM

### No. 06-1020

### <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Boston Communications Group, Inc. certify the following:

1.    The full name of every party or amicus represented by us is:

       Boston Communications Group, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

       Not applicable.

3.    All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by us are:

       No publicly held company owns 10% or more of the stock of Boston Communications Group, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

       Donald R. Dunner
       Don O. Burley
       FINNEGAN, HENDERSON, FARABOW,
         GARRETT & DUNNER, L.L.P.
       901 New York Avenue, NW
       Washington, DC  20001-4413
       (202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA 94304-1016
(650) 849-6600

Michael B. Keating
Philip C. Swain
Vickie L. Henry
FOLEY HOAG, L.L.P.
155 Seaport Boulevard
Boston, MA 02110
(617) 832-1000

Paul J. Hayes
Patrick Sharkey
Dean Bostock
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Kirk A. Damman
LEWIS RICE & FINGERSH, LLC
500 North Broadway Suite 2000
St Louis, MO 63102
(314) 444-7783

Todd E. Thompson
Simon J. Frankel
Howard Rice Nemerovski
CANADY FALK & RABKIN, P.C.
Three Embarcadero
Seventh Floor
San Francisco, CA 94111
(415) 434-1600

2

## CERTIFICATE OF SERVICE

I hereby certify that two copies of the foregoing EMERGENCY MOTION

OF BOSTON COMMUNICATIONS GROUP, INC. TO CONSTRUE OR STAY

THE DISTRICT COURT'S INJUNCTION were served by Federal Express on this

14th day of November, 2005, on the following counsel of record:

> Marshall M. Searcy III
> QUINN EMANUEL URQUHART
>   OLIVER & HEDGES, LLP
> 865 South Figueroa Street, 10th Floor
> Los Angeles, CA  90017

# EXHIBIT C

06-1020, -1078, -1079

------------

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

------------

FREEDOM WIRELESS

v.

BOSTON COMM

------------

REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION
OF BOSTON COMMUNICATIONS GROUP, INC.
TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION

------------

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue
Washington, DC  20001-4413
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
(650) 849-6600

*Attorneys for Defendant/Counterclaimant-
Cross Appellant Boston Communications
Group, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

I.    PRELIMINARY STATEMENT ................................................. 1

II.   ARGUMENT .......................................................................... 2

      A.   BCGI's Activities With Non-Defendant Carriers Are Outside
           the Scope of This Litigation ................................................. 2

      B.   BCGI Has Substantial Arguments on Appeal ....................................... 4

           1.   The Instruction on Joint Infringement Was Wrong ................... 4

           2.   The CSI Proposal Anticipates Claims 1, 27, 28, and 35 of
                the '823 Patent and Claim 15 of the '067 Patent ....................... 6

           3.   The Evidence Fails to Support the Jury's Verdict
                Concerning the "Periodic Validation" Claims ........................... 8

           4.   The Evidence Fails to Support the Jury's Verdict
                Concerning the "Direct Connection" Claims .............................. 9

      C.   The Balance of Harms Strongly Favors a Stay ................................... 10

III.  CONCLUSION ........................................................................ 10

# TABLE OF AUTHORITIES

## Cases

*3D Sys., Inc. v. Aarotech Labs., Inc.*,
   160 F.3d 1373 (Fed. Cir. 1998) ............................................................................ 5

*Arbek Mfg. v. Moazzam*,
   55 F.3d 1567 (Fed. Cir. 1995) ............................................................................ 3

*Atlantic Cleaners & Dyers, Inc. v. United States*,
   286 U.S. 427 (1932) ............................................................................................ 4

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005) ........................................................................... 5

*In re Klopfenstein*,
   380 F.3d 1345 (Fed. Cir. 2004) ........................................................................... 8

*Int'l Med. Prosthetics Research Assocs. v. Gore Enter. Holdings, Inc.*,
   787 F.2d 572 (Fed. Cir. 1986) ............................................................................. 4

*International Rectifier Corp v. Samsung Electronics Co.*,
   361 F.3d 1355 (2004) .......................................................................................... 2

*Seachange Int'l, Inc. v. C-Cor Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005) ........................................................................... 9

*Searfoss v. Pioneer Consol. Corp.*,
   374 F.3d 1142 (Fed. Cir. 2004) ........................................................................... 9

## I.    PRELIMINARY STATEMENT

Freedom claims to have obtained a "standard-issue" injunction. Freedom's interpretation of it, however, is anything but standard and finds no support in the cases Freedom cites. A standard injunction in a patent case has a simple purpose— it prevents a defendant from continuing an activity found to have infringed, and it prevents others from acting in concert with the defendant to aid its continuation of the infringing activity.

Here, however, the activity the jury found to infringe was not the act of *any* individual defendant, but rather the "joint" activity of specific pairs of defendants (BCGI and each carrier defendant). The jury's verdict thus provided a basis for enjoining the joint activity of the named defendants. But as Freedom itself represented to the court when it sought the injunction, the verdict provided no basis either to enjoin BCGI's individual conduct or to enjoin its conduct with non-parties, which the district court expressly found to be outside the scope of this case.

Even if the verdict did justify Freedom's interpretation of the injunction, the injunction should be stayed. In opposing BCGI's request for a stay, Freedom makes numerous arguments concerning both the merits of the appeal and the harm that will occur if BCGI's motion is denied. Freedom's merit-based arguments are groundless, however, and nothing it has said counters the foundation of BCGI's motion: If this Court permits Freedom to enjoin BCGI's activities with non-defendant carriers, BCGI will likely not survive to see itself vindicated on appeal. Accordingly, this Court should grant BCGI's motion.

## II.    ARGUMENT

### A.    BCGI's Activities With Non-Defendant Carriers Are Outside the Scope of This Litigation

In excluding evidence regarding the activities of BCGI and non-defendant carriers, the district court expressly found that these activities were outside the scope of this case. BCGI Mot. at 11. Further, in originally requesting an injunction, Freedom represented that it was "not seeking to enjoin any conduct that the Court ruled was beyond the scope of this action, and that was not presented at trial." Nextel Mot. at 8 (quoting Freedom's reply brief in support of its motion for injunctive relief filed in the district court).

Nevertheless, Freedom now insists that the injunction extends to the activity of non-defendant carriers, since "the injunction here is standard-issue" and uses language "taken directly from Rule 65(d)." Freedom Resp. at 3. But an injunction is not shielded from scrutiny simply because it quotes Rule 65(d). In *International Rectifier Corp v. Samsung Electronics Co.*, 361 F.3d 1355 (2004), for example, this Court vacated a district court's injunction that, in using the same language of Rule 65(d), purported to reach the activities of a non-party, Ixys. *Id.* at 1362.

Further, Freedom wrongly compares Nextel to "someone who wants to purchase an infringing product from an enjoined defendant." Freedom Resp. at 4. BCGI's services were never found to be infringing by themselves. BCGI Mot. at 11. Freedom ignores this critical distinction, however, and treats as a foregone conclusion that the combined activities of BCGI and Nextel jointly infringe its

2

patents. Freedom Resp. at 4.[1]  BCGI's and Nextel's activities, however, are the subject of a separate litigation—as are BCGI's and Alltel's activities. Accordingly, the district court's injunction should not be construed so that it would effectively short-circuit the judicial process in those cases. Nextel Mot. at 14-15.

Alternatively, Freedom proposes that this Court construe the injunction to apply to non-defendant carriers and refuse to stay it because the jury "could have found infringement under alternative theories: (1) some claims are system claims [that] could have been infringed through beneficial use of the infringing system; and (2) certain claims were capable of being fully performed by BCGI, while others were capable of being fully performed by the carriers." Freedom Resp. at 10-11.  No reasonable reading of the jury instructions or verdict form, however, supports Freedom's "black box" verdict argument.  The district court could not have been more clear—Freedom's infringement claims were directed only to the combined activities of BCGI and the defendant carriers.  BCGI Mot. at 11. Freedom's alternative arguments, therefore, amount to nothing more than speculation on what the jury might have done if Freedom had litigated its case differently.  Accordingly, even if these arguments had merit (which they do not), they could not serve as the basis for denying BCGI's motion. *See Int'l Med.*

---

[1] Freedom also is wrong in suggesting that Nextel and BCGI bear the burden of proving that Nextel's conduct with BCGI *does not* infringe. Freedom Resp. at 4. *See Arbek Mfg. v. Moazzam*, 55 F.3d 1567, 1569 (Fed. Cir. 1995) ("To show contempt, the patent owner must prove by clear and convincing evidence that 'the modified device falls within the admitted or adjudicated scope of the claims and is, therefore, an infringement.'").

3

*Prosthetics Research Assocs. v. Gore Enter. Holdings, Inc.*, 787 F.2d 572, 573 n.2 (Fed. Cir. 1986) ("Affirmance on an alternative ground is appropriate only when such affirmance does not depend on fact-finding.").

### B.   BCGI Has Substantial Arguments on Appeal

Even if the injunction were construed to cover the conduct of non-defendant carriers, this Court should stay it until the merits of BCGI's appeal are considered. As demonstrated in its moving brief and further explained below, the district court committed serious errors.[2]

### 1.   The Instruction on Joint Infringement Was Wrong

The theory of joint infringement that was adopted by the district court does not exist. BCGI Mot. at 13-15; Nextel Mot. at 12-14. In arguing otherwise, Freedom focuses on § 271(a)'s use of the term "whoever." Specifically, Freedom argues that since § 101 uses the word "whoever" in identifying who may obtain a patent and "joint patenting in the form of joint inventorship is plainly allowed," "[b]inding principles of statutory construction require the same interpretation in Section 271." Freedom Resp. at 6-7. Notwithstanding Freedom's assertion, there is no "binding" rule that "requires" the same word to mean the same thing in different statutory provisions. *See, e.g., Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory

---

[2] Although Freedom argues that to obtain a stay, BCGI "must establish by a 'strong showing'" that it will prevail (Freedom Resp. at 5), that is not correct. Where, as here, the moving party will be severely harmed without a stay, the moving party need only show that it can raise a "substantial issue." BCGI Mot. at 12.

construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance."). To the contrary, given the very different policies underlying inventorship and infringement, there is no reason at all to conclude that "whoever" should be construed the same way for § 271 as it is for § 101. *Cf. 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 n.4 (Fed. Cir. 1998) (declining to "import the authority construing the 'on sale' bar of § 102(b) into the 'offer to sell' provision of § 271(a)" because of different policies underlying the two provisions).

Freedom's attempt to find support for its joint infringement theory in *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005) (Freedom Resp. at 10-11 n.9), also falls flat. *Cross Medical* dealt with a claim to "[a] fixation device" having "an interface" that was "joined to [a] bone." *Cross Medical*, 424 F.3d at 1305. Although the device sold by Medtronic was not yet joined to a bone (that was done by the surgeon), the plaintiff insisted that Medtronic was a direct infringer because it directed surgeons to make an infringing device by joining Medtronic's product to a bone. *Id.* at 1311. The Court rejected that theory, however, observing that the surgeons were not Medtronic's agents. *Id.* Thus, the only lesson relevant to this case that can be drawn from *Cross Medical* is that, absent an agency (or control) relationship, one party cannot be responsible as a direct infringer based on the conduct of another party. BCGI Mot. at 13-15.

Finally, Freedom is incorrect when it argues that "the facts here compelled a finding of joint infringement even under BCGI's severe standard." Freedom Resp. at 9. The activities identified by Freedom (contracts, coordination, and frequent

5

communication) do not constitute "control" in the legal sense, and whether or not they might provide a basis for liability under a lesser standard requiring knowledge and intent (*see* BCGI Mot. at 14-15) is irrelevant. The jury was not instructed under either of these standards, but was instead told that it had to find only that the parties "worked together." That ambiguous instruction failed to adequately guide the jury, and, as noted previously, speculating what the jury might have done if instructed differently is impermissible. *See* pages 3-4 *supra*.

### 2. The CSI Proposal Anticipates Claims 1, 27, 28, and 35 of the '823 Patent and Claim 15 of the '067 Patent

In its moving brief, BCGI demonstrated that no reasonable jury could have concluded that claims 1, 27, 28, and 35 of the '823 patent and claim 15 of the '067 patent were valid over the CSI proposal. BCGI Mot. at 16-17. Freedom makes three arguments in response (Freedom Resp. at 12-14), but none is convincing.

First, Freedom argues that the CSI proposal "says nothing about how pre-paid service would be implemented in the CSI system, has no pre-paid accounting system, no mechanism for terminating calls when the balance runs out, and no indication how pre-paid balances would be handled or stored." *Id.* at 13. None of these details, however, is recited in any of the claims subject to BCGI's arguments on this issue. BCGI Mot. at 16-17.

Second, Freedom criticizes BCGI's expert (Professor Wicker) because he allegedly showed only that the "concepts" or "ideas" of the claims were found in the CSI proposal. Freedom Resp. at 14. That, however, is a gross distortion of Professor Wicker's testimony. In actuality, Professor Wicker specifically showed

6

where the claim elements that were required by the district court's construction were found in the CSI Proposal (BCGI Mot. at 9-10)—and his analysis included a traditional limitation-by-limitation comparison to claim 15 of the '067 patent. Ex. 35 (Apr. 12, 2005, Trial Tr.) at 101-06. All the other claims at issue (claims 1, 27, 28, and 35 of the '823 patent) recite the same (or fewer) elements, except that they deal with calls the prepaid subscriber receives ("incoming calls") rather than calls the subscriber makes ("outgoing calls"), and claims 1, 27, and 28 further recite a very basic subscriber verification step. And Professor Wicker testified where these additional features were taught in the CSI proposal. BCGI Mot. at 9-10; Ex. 35 at 108-10.

Thus, contrary to Freedom's argument, Professor Wicker testified where all the elements of the five claims now at issue were found in the CSI proposal. Because Freedom asserted 32 claims and Professor Wicker analyzed several prior art references, he used a short-hand method (his "three basic ideas" and color-coded claim charts) to summarize his conclusions rather than testify on a limitation-by-limitation basis concerning each asserted claim. But under the circumstances, Professor Wicker's approach was eminently reasonable, and it in any event did not affect the testimony he gave regarding the five claims now at issue. Indeed, while Freedom attacks Professor Wicker's *methodology*, it points to no limitation of any of these five claims that is missing from the CSI proposal. On the contrary, Freedom mentions only limitations from *other* claims, i.e., the "claims that recite particular implementations and methods for delivering pre-paid operation." Freedom Resp. at 13.

7

Finally, Freedom argues that "the jury could have determined that the CSI documents were not sufficiently accessible to be printed publications." Freedom Resp. at 14. Not true. Professor Wicker testified that the proceeding, which was open to the public, was highly publicized at the time, and that he easily obtained the CSI materials from the public records of the CPUC using only the docket number. Ex. 35 at 43-45. Since these facts were uncontested, the question of whether the CSI proposal was a "printed publication" is a question of law. *See In re Klopfenstein*, 380 F.3d 1345, 1347 (Fed. Cir. 2004). Moreover, the facts compel the conclusion that the CSI proposal was "publicly accessible," which is the relevant test for a printed publication. *Id.* at 1348 ("the key inquiry is whether or not a reference has been made 'publicly accessible'").

### 3. The Evidence Fails to Support the Jury's Verdict Concerning the "Periodic Validation" Claims

BCGI's alarm-based method for call accounting is indistinguishable from the prior art D'Urso method that was identified, criticized, and distinguished by Freedom in its patent and during prosecution. BCGI Mot. at 5-9, 16. Freedom does not deny this. Instead, Freedom argues that it never disclaimed D'Urso's alarm-based method. This same argument, however, was correctly rejected by the district court, which properly required periodic validation in every claim that recited some call-accounting method. BCGI Mot. at 6.

Freedom also argues that it presented sufficient evidence of infringement for these claims. Freedom Resp. at 15-16. The evidence cited by Freedom, however, confirms that BCGI's accounting method relied on the same kind of simple,

8

computer-based alarm used in D'Urso and disclaimed by Freedom. Therefore, the infringement verdict for these claims cannot stand. BCGI Mot. at 16.

### 4. The Evidence Fails to Support the Jury's Verdict Concerning the "Direct Connection" Claims

While Freedom recognizes that the district court concluded that it had disclaimed coverage of anything other than a prepaid billing system that directly connected calls to the LEC, Freedom argues that the district court erred in this regard. Freedom Resp. at 16-17. For all the reasons BCGI stated previously, however, the district court should have granted JMOL to BCGI on the 17 claims that the court properly construed to require a direct connection. BCGI Mot. at 5, 15-16. Moreover, there is no merit to Freedom's argument that the "all elements" rule does not apply here because "'direct connection' is not an element of any claim, but is instead a feature the district court incorporated" into its claim construction. Freedom Resp. at 17. Indeed, that argument is refuted by the two cases cited in BCGI's brief, *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005), and *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004), where the "all elements" rule was applied in each case to limitations that did not expressly appear in the claim, but were instead part of the Court's construction.

Finally, even if Freedom were right, the judgment still could not be sustained. The 17 claims at issue would not be infringed in any event, since the periodic validation limitation of each of these claims would remain unmet. BCGI Mot. at 5-7, 16.

9

## C.    The Balance of Harms Strongly Favors a Stay

Freedom does not deny that the district court's injunction, if construed to cover non-defendant carriers, would put BCGI out of business. Instead, Freedom argues that "[t]he verdicts themselves establish irreparable harm to Freedom." Freedom Resp. at 18. Both of the cases Freedom cites in support of this proposition, however, concern the propriety of injunctions *after* this Court has ruled on the merits of the underlying appeal. At this stage—and in a situation where the balance of harms so clearly favors maintaining the status quo pending appeal—these cases have little if any relevance. BCGI Mot. at 18-19.

Freedom also argues that it will be harmed if BCGI goes bankrupt and thereby "succeed[s] in never having to pay Freedom." Freedom Resp. 19. In offering this unusual definition of "success," however, Freedom ignores that the carrier defendants are jointly liable for the damages awards in this case and there is no evidence (or even suggestion) that they cannot pay the full amount of the judgment. Indeed, Cingular and BCGI have already posted four bonds totaling over $140 million (representing 110% of the original judgment plus $500). In short, therefore, Freedom's concerns about non-payment are fictional, and it will suffer no harm if the injunction is stayed pending resolution of BCGI's appeal.

## III.  CONCLUSION

For the reasons set forth in this and its moving brief, BCGI respectfully requests that its motion be granted.

10·

.

.

Dated:  November 28, 2005

*Donald R. Dunner/dob*
Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC  20001-4413
Telephone:  (202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
Telephone:  (650) 849-6600

*Attorneys for Defendant/Counterclaimant-*
*Cross Appellant Boston Communications*
*Group, Inc.*

11

## CERTIFICATE OF SERVICE

I hereby certify that two copies of the foregoing UNOPPOSED MOTION OF BOSTON COMMUNICATIONS GROUP, INC. FOR LEAVE TO FILE A REPLY BRIEF IN SUPPORT OF ITS EMERGENCY MOTION TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION, the attached proposed ORDER, and the REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION OF BOSTON COMMUNICATIONS GROUP, INC. TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION were served by Federal Express (with courtesy copies sent by facsimile or email) on this 28th day of November, 2005, on the following counsel of record:

> Marshall M. Searcy III
> QUINN EMANUEL URQUHART
>   OLIVER & HEDGES, LLP
> 865 South Figueroa Street, 10th Floor
> Los Angeles, CA  90017

# EXHIBIT D



**FINNEGAN**
**HENDERSON**
**FARABOW**
**GARRETT &**
**DUNNER**LLP

901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

**DONALD R. DUNNER**
202-408-4062
don.dunner@finnegan.com

November 28, 2005

The Honorable Jan Horbaly                          **BY HAND DELIVERY**
Clerk of Court
United States Court of Appeals
  for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

> Re:   *Freedom Wireless v. Boston Comm, 06-1020*

Dear Mr. Horbaly:

On November 14, 2005, Boston Communications Group, Inc. ("BCGI") filed an emergency motion in which it asked the Court either to construe the district court's injunction as not applying to non-defendants or, to the extent it does, to stay the injunction pending resolution of BCGI's appeal. In an order issued on November 15, 2005, the Court temporarily stayed the injunction "pending receipt of Freedom's response and consideration by the court of the papers," and required Freedom (as well as the appellees, "if they wish") to respond by November 22, 2005. To the best of BCGI's knowledge, Freedom, but none of the appellees, filed a response on November 22. Today, BCGI is filing a motion for leave to reply to Freedom's response, along with a proposed reply.

Even though the injunction has now been temporarily stayed, BCGI has recently learned that some of its non-defendant carriers are concerned enough about the possibility that the injunction may be construed to cover them—and not stayed pending resolution of BCGI's appeal—that they are attempting to find an alternative supplier for BCGI's services. If this occurs, and non-defendant carriers sever their current relationship with BCGI, BCGI's continued existence may be seriously jeopardized. Accordingly, BCGI respectfully requests that the Court rule on BCGI's pending motion in as expedited a fashion as possible.

Respectfully submitted,

Donald R. Dunner

Donald R. Dunner
*Counsel for Boston Communications Group, Inc.*

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo

The Honorable Jan Horbaly
November 28, 2005
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

cc:    Marshall M. Searcy III (by email)
       Richard McMillan, Jr. (by email)
       Claudia Wilson Frost (by email)
       Mark D. Wegener (by email)