# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FREEDOM WIRELESS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-11062 EFH |
| ) | |
| BOSTON COMMUNICATIONS GROUP, ) | |
| INC. and ALLTEL CORP., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## REPLY MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS
## REGIONAL CARRIERS FOR PROTECTIVE ORDER

Defendants Bluegrass Cellular, Inc., Cellular Properties, Inc. d/b/a Cellular One of East Central Illinois, Centennial Cellular Operating Co., LLC, Cincinnati Bell Wireless LLC, Dobson Cellular Systems, Inc., East Kentucky Network, LLC d/b/a Appalachian Wireless, Farmers Cellular Telephone, Inc. d/b/a Farmers Wireless, Great Lakes of Iowa, Inc., Marseilles Cellular, Inc. d/b/a Illinois Valley Cellular, MTA Communications d/b/a MTA Wireless, Missouri RSA #7 Limited Partnership d/b/a Mid-Missouri Cellular LLP, Southern Illinois RSA Partnership d/b/a First Cellular of Southern Illinois, South #5 RSA Limited Partnership d/b/a Brazos Cellular Communications, Ltd., Thumb Cellular LLC, Uintah Basin Electronic Telecommunications d/b/a UBET Wireless (collectively, "the Regional Carriers") respectfully submit this reply brief in support of their motion for a protective order.

**I.    INTRODUCTION**

For months, the Regional Carriers have engaged Plaintiff Freedom Wireless, Inc. ("Freedom") in good-faith discussions regarding a protective order in this case. Despite the lack of any final protective order, the Regional Carriers have moved forward with the court-ordered jurisdictional discovery with the expectation that Freedom would be amenable to their concerns. Instead, with the Regional Carriers' sensitive business and financial information in hand, Freedom has felt free to ignore their concerns and has offered few glimmers of compromise. As described below, Freedom has even chosen to abandon some of its earlier positions when confronted with the possibility of having to defend them before the Court. But, with respect to the positions it has not yet chosen to alter, Freedom continues to make unsupported assertions regarding its need to provide its executives with highly sensitive business and technical information.

Thus, the Regional Carriers respectfully request that the Court enter the Regional Carriers' proposed protective order, which has been in place and honored for the past two and a half months, in its entirety as the final protective order in this case.

**II.   DISCUSSION**

    **A.    The Regional Carriers' Good-Faith Negotiations Regarding the Protective Order**

Freedom has not disputed some of the key facts presented in the Regional Carriers' Motion for Protective Order. On March 23, 2006, two weeks before the date on which the Regional Carriers responded to Freedom's document requests and interrogatories, counsel for the Regional Carriers sent Freedom a proposed protective order. *See* Memorandum of Law In Support of Motion of Defendants Regional Carriers for Protective Order ("Mot.") at 3. On April 4, 2006, Freedom finally responded to the Regional Carriers' request by agreeing to abide by the proposed protective order for thirty days. *Id.* Finally, on April 18, 2006, the Regional Carriers at last received Freedom's first "red-line" comments on the proposed protective order.

2

*Id.* at 3 & n.4. After several attempts to discuss Freedom's comments, the Regional Carriers did not learn of the basis for its edits until April 28, 2006. *See* Declaration of Andrew N. Shen in Support of Defendants Regional Carriers' Motion for Protective Order, dated June 8, 2006 ("Shen Decl."), Exh. I.

Given Freedom's substantial delays in presenting its initial comments and its reasons for those edits, the Regional Carriers are mystified by Freedom's charge that they "have refused to engage in a meaningful meet and confer." *See* Plaintiff Freedom Wireless, Inc.'s Opposition to Defendants Regional Carriers' Motion for Protective Order ("Opp.") at 3. On May 17, 2006, Freedom made it clear that it no longer wished to negotiate solely with the Regional Carriers. *See* Shen Decl., Exh. M. After that date and at Freedom's request, the Regional Carriers began to coordinate with their co-defendants on issues relating to the protective order. *See* Shen Decl., Exh. N. During this time, Freedom was no doubt well-aware that counsel for the Regional Carriers were busily defending depositions around the country. Despite those efforts, Freedom ended all negotiations without warning. *See* Shen Decl., Exh. A.

Freedom's claim that it has "not received reciprocation" is similarly inaccurate. *See* Opp. at 3. For example, on May 12, 2006, the Regional Carriers agreed to Freedom's proposal with respect to Mr. Harned.[1] *See* Shen Decl., Exh. L. Further, undercutting Freedom's self-proclaimed "willingness to compromise," Opp. at 2, in April, Freedom flatly rejected the Regional Carriers' request that a notice mechanism apply to Freedom's proposed paragraph 6(f), which would allow disclosure of "Restricted Confidential – Attorney's Eyes Only" material to persons scheduled to appear for deposition or trial. *See* Shen Decl., Exh I. As discussed below in Section E, Freedom now wants to take the Regional Carriers up on this reasonable request made two months ago that would not have required court intervention.

---

[1] The Regional Carriers have never agreed to any provision regarding Mr. Fougnies. They also observe that Freedom did not include such a provision in its initial proposed red-line or the protective order it has urged the Court to adopt. *See* Shen Decl., Exh. G; Taggart Aff., Exh. B.

3

Freedom's self-serving rhetoric aside, it is indisputable that Freedom was the party that unilaterally decided to end negotiations, not the Regional Carriers. Thus, on short notice, the Regional Carriers were forced to file their Motion for Protective Order with the Court.

**B.   Freedom Is Unreasonably Attempting to Modify the Current Protective Order**

As recounted above, the Regional Carriers sent a proposed protective order to Freedom prior to serving their responses to its document requests and interrogatories. Freedom's counter-proposal was not sent to the Regional Carriers until April 18, almost a full month after the Regional Carriers indicated that they wished to open discussions. During this entire period, Freedom never provided the Regional Carriers with any hint that it desired significant changes to the protective order with respect to the most confidential category of material. Thus, only *after* the Regional Carriers had provided Freedom with a substantial amount of confidential information, did Freedom indicate that it believed that many of its in-house executives should have access to "Restricted Confidential – Attorney's Eyes Only" material.

Freedom should not be allowed to benefit from its sleight of hand. In general, parties are prohibited from changing the terms of a protective order that has already governed the litigation. *See Madanes v. Madanes*, 199 F.R.D. 135, 141 (S.D.N.Y. 2001) ("once a party has relied on a protective order, a court should make every effort to preserve the confidentiality of the evidence produced as a result"); *see also Murata Manufacturing Co., Ltd. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 179 (N.D. Ill. 2006) ("it is the burden of the party seeking to vacate or modify the protective order . . . to demonstrate good cause").

Both parties have abided by the Regional Carriers' protective order since April 7, 2006 without incident. *See* Mot. at 3; Shen Decl., Exh. H. Further, Freedom has not disputed that it "has never indicated that the terms of the Regional Carriers' proposed protective order has hindered its efforts to conduct jurisdiction-related discovery or would interfere with future briefing." Mot. at 3. Instead, Freedom has only made vague, unsubstantiated claims that the Regional Carriers' proposed protective order would interfere in the plaintiff's litigation of this

4

case. *See* Opp. at 3 (describing the order as "unnecessarily restrictive" and "strategically structured to prevent Freedom access to information"). Freedom has never provided any concrete example of why the Regional Carriers' protective order has hindered its litigation efforts. The Regional Carriers have provided Freedom with over 300,000 pages of documents as well as written responses to numerous interrogatories. *See* Motion at 1-2; Shen Decl. ¶¶ 2-3. Since that time, Freedom has taken the depositions of twelve Regional Carriers. *See* Supplemental Declaration of Andrew N. Shen ("Shen Supp. Decl.") ¶ 2. Freedom has never stated that the Regional Carriers' protective order restricted its ability to review the materials provided or to question deponents on the multitude of financial and technical topics listed in Freedom's deposition notices. *See, e.g.,* Shen Supp. Decl., Exh. A (topics 5-8, 12-17, 23).

In addition, Freedom's cited authority does not establish that the Court may not adopt the Regional Carriers' proposed order. *See* Opp. at 5-6. First, in *FTC v. Standard Financial Mgt. Corp.*, 830 F.2d 404, 412 (1st Cir. 1987), the First Circuit did not discuss protective orders and Rule 26(c). Second, *Alexander Housing LLC v. International Brotherhood of Electrical Workers*, 2004 WL 1718654 (N.D. Ill. Jul. 29, 2004), an unreported opinion from Illinois, does not accurately capture the broad discretion offered to district courts in evaluating protective orders. The First Circuit does not require the movant to provide "specific examples" of harm in order to justify a protective order. "Protective orders of various kinds are employed in civil cases, ranging from true blanket orders (everything is tentatively protected until otherwise ordered) to very narrow ones limiting access only to specific information after a specific finding of need." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 532 (1st Cir. 1993). "District judges need wide latitude in designing protective orders, and the Federal Rules of Civil Procedure reflect that approach." *Id.* In short, given the discretion recognized by the First Circuit, the Court can appropriately enter the protective order proposed by the Regional Carriers without the specificity that Freedom believes is required.

### C. Freedom Has Not Established Why its President Should Have Access to "Financial Data"

In its opposition, Freedom claims that it "can establish good cause for permitting Mr. Day to have access to financial information."[2]  Opp. at 6.  However, after making such a claim, Freedom fails to explain the basis for this "good cause."  The only explanation offered by Freedom is that "Mr. Day will not be able to effectively assist counsel in preparation of the litigation" without any further elaboration of what assistance Freedom's counsel requires.  *See id.*  The information about which Mr. Day is supposedly an expert, "Freedom's financial situation" and "the prepaid wireless industry", is similarly vague.  *See id.*  Based on the information put forth by Freedom, it is impossible to conclude that he has any expertise in relevant areas, let alone whether he is the person most knowledgeable about them.[3]  *See Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988) (noting that the party arguing for greater access had "yet to investigate the availability of qualified experts").  Lastly, while it complains about "costly experts", Freedom does not offer any evidence that it has attempted to ascertain the hourly rates charged by any appropriate experts.

Freedom's arguments regarding Mr. Day continue to ignore the Regional Carriers' valid confidentiality concerns.  The concern of the Regional Carriers is that despite Mr. Day's best efforts, he would be unable to compartmentalize the business information that Freedom wants him to access.  *See United States v. Dentsply Int'l Inc.*, 187 F.R.D. 152, 159-60 (D. Del. 1999); *Safe Flight*, 682 F. Supp. at 22 (while the Court stated that the plaintiff's President was "a man of great moral fiber," rejecting the conclusion that he could "separate" his own ideas from the confidential material belonging to the defendant).  For the same reason, the Regional Carriers

---

[2] The Regional Carriers observe that Freedom again fails to offer a definition of what "financial information" or "financial data" it believes Larry Day should be able to access.  *See* Mot. at 4.

[3] The Regional Carriers also observe that the instant litigation is the second case brought by Freedom's counsel regarding the same patent infringement claims and theories.  Whatever guidance Freedom counsel believes it needs, it has already received and should be able to apply a second time to very similar facts.

believe that Mr. Day's agreement to sign the undertaking attached as Exhibit A to the proposed order is insufficient.[4] The Regional Carriers also do not believe that the deposit of such information at Quinn Emanuel's offices adequately addresses this concern.

Finally, while Freedom claims that the Regional Carriers' position is motivated out of "an improper strategic purpose," the plaintiff has never explained how the use of an independent, third-party expert would hinder its litigation efforts. As explained the Regional Carriers' opening papers, "the retention of third-party experts is a well-accepted method of balancing valid concerns regarding the disclosure of highly confidential information and the needs of opposing counsel in preparing for litigation." *See* Mot. at 4 (citing *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1532 (9th Cir. 1992)). "In assessing whether to issue a protective order, courts generally balance the harm to defendant against the relevance of and the necessity for the information." *Multi-Core, Inc. v. Southern Water Treatment Co.*, 139 F.R.D. 262, 264 (D. Mass. 1991) (citing 8 C. Wright & A. Miller, Federal Practice and Procedure § 2043 (1970)). One of the ways to achieve such a balance is limiting access to trial counsel and independent consultants. *See id.* (citing *Spartanics, Ltd. v. Dynetics Engineering Corp.*, 54 F.R.D. 524 (N.D. Ill. 1972)). In sum, Freedom seeks to avoid the necessary balancing for reasons that it continues to keep to itself.

### D. Robert Pressman Should Execute An Agreement Preventing Him From Future Patent Prosecution Work for Freedom

Freedom's arguments with respect to Robert Pressman's access to "Restricted Confidential – Attorney's Eyes Only" material remain bewildering. In their motion, the Regional Carriers stated that they were willing to provide Mr. Pressman with access to this information if agrees to execute "an agreement stating that he will not, in the future, be involved

---

[4] The Regional Carriers have, on several occasions, indicated that if Mr. Day does execute the undertaking attached as Exhibit A, he may have access to documents designated as "Confidential" but not all "Confidential Material." *See* Shen Decl., Exhs. J, L. As explained further in correspondence between counsel, the proposed protective order defines the latter term as encompassing both materials designated as "Confidential" and "Restricted Confidential – Attorney's Eyes Only." *See id.*; Shen Decl., Exh. E at 2.

7

in patent prosecution for Freedom." Mot. at 6. The Regional Carriers have not changed their position. In its opposition, Freedom states that "Mr. Pressman does not take any role in patent prosecution and has no intention of doing so." Opp. at 9. Thus, the Regional Carriers are still waiting for Freedom to "back up" its claims.

Perhaps what Freedom really wants to argue is that the Regional Carriers should not doubt its counsel's promises. Yet the Regional Carriers have substantial reason to do so. In *Freedom Wireless, Inc. v. Boston Communications Group, Inc., et al.*, Civil Action No. 00-CV-12234 ("*Freedom I*"), shortly before trial, Freedom's counsel denied the existence of a protective order. *See* Shen Supp. Decl., Exh. B (Plaintiff Freedom Wireless, Inc.'s Opposition to Defendants' Motion for Protective Order). Despite having abided by a protective order for approximately three years, *see id.*, Exh. C at ¶ 4, Freedom abruptly stated, "there is no protective order or stipulation in this case." *See id.*, Exh. B. Freedom dismissively referred to the operative protective order in *Freedom I* as a "red-lined, unsigned, unfiled, draft agreement." *Id.* The Court quickly corrected Freedom and stated that "[t]he Stipulation and Protective Order is to be strictly complied with." *See* Shen Supp. Decl., Exh. C. Given Freedom's past history of tossing its obligations aside when convenient, the Regional Carriers remain willing to provide Mr. Pressman with access to "Restricted Confidential – Attorney's Eyes Only" material but only if the requested agreement is executed.

### E. The Regional Carriers Will Agree to Adopt a Notice Procedure With Respect to "Attorney's Eyes Only" Documents Naming the Witness

The Regional Carriers continue to object to Freedom's original proposal that individuals who are "named" in a "Restricted Confidential – Attorney's Eyes Only" document be allowed to view such documents. Freedom has belatedly recognized that its previous position was untenable. The Regional Carriers note that Freedom previously attempted to adopt this position in *Freedom I* and was denied by the Court. *See* Shen Supp. Decl., Exhs. B, D.

In accordance with Freedom's further modification, *see* Opp. at 10, the Regional Carriers will agree to allow access to "Restricted Confidential – Attorney's Eyes Only" material to

8

individuals who are named in those documents if: (1) the Regional Carriers have noticed that individual as a witness for deposition or trial and (2) the Regional Carriers give Freedom written notice, at least five business days prior to that witness's scheduled testimony, that they intend to examine that individual with documents designated "Restricted Confidential – Attorney's Eyes Only."

### F.   Freedom's Other Proposed Changes Should be Rejected

In its Opposition, Freedom requests the Court to adopt seven additional proposed changes which Freedom claims "have not been the focus of negotiation." Opp. at 4 n.3. The implication that the proposed changes are without controversy is not correct, and the Regional Carriers ask the Court to reject them. Indeed, the representation that these proposed changes are "minor" is emblematic of Freedom's disregard for the sensitivity of the Regional Carriers' confidential information.

For example, Freedom would have the Court usher in its new paragraph 5(c), which would allow disclosure of "Confidential" material to Freedom executives Day, Fougnies, and Harned. *See* Taggart Aff., Exh B. (Freedom's Redline of Defendant's Stipulation and Protective Order ¶ 5(c)). Such disclosure to 75% of Freedom's workforce would effect an end-run around the protective order, rendering the "Confidential" designation largely meaningless. Moreover, Freedom's proposed change to paragraph 8, limiting the reporting obligations of experts to only the last four years, could serve to cloak those who had involvement in the Freedom I litigation, shielding the Regional Carriers from reasonable bases to object to the disclosure of Confidential matter. *Id*. at ¶ 8.

Though the Regional Carriers are willing to accept Freedom's proposed changes to paragraphs 3(f) and 17, *see* Taggart Aff., Exh B., which pertain to information introduced in open court proceedings, the Regional Carriers request the Court reject the additional changes proposed, but unbriefed, by Freedom. *See* Taggart Aff., Exh B ¶¶ 5(c), 8, 10, 12, 19.

9

**III.   CONCLUSION**

For the foregoing reasons, the Regional Carriers request that the Court enter their proposed protective order, attached as Appendix A to the proposed Order submitted with their Motion for Protective Order, as a final Order.

Dated:  June 23, 2006                                             Respectfully submitted,


By:   \_\_/s/ Andrew N. Shen_____
     Michael H. Page
     Leo L. Lam
     Matthias A. Kamber
     Andrew N. Shen
     Kevin T. Reed
     KEKER & VAN NEST, LLP
     710 Sansome Street
     San Francisco, CA  94111-1704
     Telephone:  (415) 391-5400
     Facsimile:  (415) 397-7188
     mpage@kvn.com
     llam@kvn.com
     mkamber@kvn.com
     ashen@kvn.com
     kreed@kvn.com

     Dean G. Bostock, Esq. (BBO#549747)
     Patrick J. Sharkey, Esq. (BBO#454820)
     Mintz, Levin, Cohn, Ferris,
     Glovsky and Popeo, P.C.
     One Financial Center
     Boston, Massachusetts 02111

     Telephone:  (617) 542-6000
     Facsimile:  (617) 542-2241
     dbostock@mintz.com
     psharkey@mintz.com

     Attorneys for DEFENDANTS
     REGIONAL CARRIERS

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 23, 2006.

          ___/s/ Kevin T. Reed_____
          Kevin T. Reed